**Harold HARRIS, Continental Casualty Company and National Fire Insurance Company of Hartsford, etc., Plaintiffs-Respondents,**

v.

**UNION ELECTRIC COMPANY, Defendant-Appellant,**

**St. Louis Union Trust, et al., Defendant-Cross-Appellant.**

Nos. 42583, 42615.

Missouri Court of Appeals, Eastern District, Division Two.

June 16, 1981.

Motion for Rehearing and/or Transfer to Supreme Court Denied Sept. 21, 1981.

Application to Transfer Denied Nov. 10, 1981.

---

Francis X. Duda, St. Louis, for defendant-appellant.

Thomas S. McPheeters, Jr., David S. Slavkin, St. Louis, for defendant-cross-appellant.

David L. Campbell, St. Louis, for plaintiffs.

John J. Cole, St. Louis, for Underwriters.

GUNN, Judge.

Defendant Union Electric (UE) appeals, and defendant St. Louis Union Trust cross-appeals, from a trial court order [1] granting plaintiff's summary judgment motion for declaratory and injunctive relief. Plaintiffs, suing individually and on behalf of all holders of Union Electric's First Mortgage Bonds, 10½ Series due March 1, 2005 (Series 2005 Bonds) sought a declaration of the redemption features of their bonds. We are compelled to reverse and remand for further proceedings consistent with this opinion.

At the outset, we comment that the trial court was faced with an enormously complex and massive case. The transcript on appeal alone contains 38 volumes. And we are required to treat a multitude of issues.

On March 26, 1975, UE issued $70,000,000 of Series 2005 Bonds under a Supplemental Indenture between it as grantor and St. Louis Union Trust Company, its mortgage trustee. The 1975 Indenture incorporated and referred to various portions of an Indenture of Mortgage and Deed of Trust dated June 15, 1937 (the Original Indenture) as well as other indentures from 1937 to 1975 that also supplemented the Original Indenture.

The present controversy began in April 1978 when UE publicly announced that it intended to redeem about $50,000,000 of

---

1. Under Rule 81.06, Mo.R.Civ.P., the trial court designated the order final and appealable.

Series 2005 Bonds at the "special redemption" price of 100% of the par value of the bonds. To implement this redemption plan, UE had made short-term borrowings of cash at an interest rate of less than 10.6% and deposited with the trustee $700,000 for the Improvement Fund for Series 2005 Bonds and $49,187,000 for a Maintenance Fund that applied to all bonds outstanding under the Original Indenture. UE's plan was to replace these short-term borrowings with a long-term bond issue at 9.35%.

Plaintiffs objected to the redemption plan contending that the 1975 Indenture expressly precluded a redemption from funds obtained at an interest cost less than 10.6% for the first ten years, until March 1, 1985. This lawsuit was filed on May 9, 1978. Within a month UE announced that it had abandoned its redemption scheme for the time being, had withdrawn the cash from the Maintenance Fund and replaced it with property additions.

The plaintiffs' amended petition is in eleven counts; the first four counts name UE as the sole defendant and seek declaratory and injunctive relief, while the remaining seven counts also name certain underwriters as defendants and seek an award of monetary damages. Counts I, II and IV [2] are the only counts presently before this Court, having been consolidated and severed for separate trial by the trial court. Counts I and II seek declaratory and injunctive relief, alleging that if UE's redemption plan is permitted under the indentures, UE has violated the Trust Indenture Act of 1939, § 323(a) (15 U.S.C. § 77www) (Count I), and the Securities Act of 1933, § 17(a) (15 U.S.C. § 77q) (Count II), by not adequately disclosing the redemption rights in the prospectus. Count IV is headed "Declaratory Judgment" (presumably an action under the Missouri statutes dealing with declaratory judgments, §§ 527.010–.130, RSMo 1978). It basically reiterates the allegations of the first three counts and again seeks a declaration of plaintiffs' rights un-

der the indentures and an injunction prohibiting the redemption plan contemplated by UE.

The bond mortgage and trust indentures are contained in a document several hundred pages in length. We set forth only those sections vitally important to resolution of the redemption dispute. Section 1, Article III, of the 1975 Supplemental Indenture is entitled "Redemptions" and states:

The Bonds of 2005 Series shall, subject to the provisions of Article V of the Original Indenture, be redeemable (*otherwise than by operation of the Improvement Fund or the Maintenance Fund provided in Article IV hereof or pursuant to Section 8 of Article VIII of the Original Indenture*), at any time or from time to time prior to maturity, at the option of the Board of Directors of the Company, either as a whole or in part by lot, at the then applicable *regular redemption price* set forth in the form of Bonds of 2005 Series in Section 3 of Article I of this Supplemental Indenture, together in each case, with accrued interest to the redemption date.

In case of the redemption of less than all the outstanding bonds of 2005 Series, the particular Bonds or portions (equal to $1000 or a multiple thereof) of Bonds of a denomination larger than $1000 to be redeemed shall be determined by lot in such manner as the Trustee in its discretion shall deem proper, as in the Original Indenture provided.

Irrespective of the provisions of this Section 1, Bonds of 2005 Series shall not be redeemable at the option of the Company at any time prior to March 1, 1985 (*other than by the operation of the Improvement Fund or the Maintenance Fund provided in Article IV of this Supplemental Indenture or pursuant to Section 8 of Article VIII of the Original Indenture*) if moneys for such redemption are obtained by the Company directly or indirectly from or in anticipation of bor-

---

2. Count III, alleging violations of Rule 10b–5, 17 C.F.R. § 240, 10b–5 (1980), was dismissed by plaintiffs apparently in recognition of the federal courts' exclusive jurisdiction over such claims.

rowings by or for the account of the Company at an effective interest cost (computed in accordance with generally accepted financial practice) of 10.60% or less per annum. [emphasis added].

The third paragraph above provides the initial controversy. It limits redemption for the first ten years if the funds for redemption come from borrowings at less than 10.6%. Plaintiffs maintain that this restriction on lower interest cost refunding also applies to redemptions "by the operation of the Improvement Fund or the Maintenance Fund provided in Article IV of this Supplemental Indenture or pursuant to Section 8 of Article VIII of the Original Indenture." UE insists, however, that the quoted parenthetical language provides exceptions to the ten-year restriction on lower interest cost refunding; that the restriction only applies to "regular" redemptions and does not apply to "special" redemptions.

"Special" redemptions are mentioned in Section 3, Article IV of the 1975 Supplemental Indenture:

All cash paid to the Trustee for the Improvement Fund for Bonds of 2005 Series provided for in Section I of this Article IV shall be held in trust, but not as part of the trust estate, for the benefit of the holders of Bonds of 2005 Series and, if in excess of Fifty Thousand Dollars ($50,000), *shall* be applied to the redemption, on the earliest practical date (but not earlier than the next succeeding May 1) next succeeding the date of payment of such cash, at the *special redemption price* set forth in the form of Bonds of 2005 Series in Section 3 of Article I of this Supplemental Indenture applicable on the date fixed for such redemption, together with accrued interest to the redemption date, of a principal amount of Bonds of 2005 Series equal, as near as may be, to the amount of such cash. . . .

Bonds of 2005 Series shall be redeemable, at any time and from time to time on and after May 1, 1977, for the Improvement Fund for Bonds of 2005 Series provided in Section 1 of this Article IV, and at any time and from time to time on and after March 1, 1975, pursuant to Section 8 of Article VIII of the Original Indenture, at the then applicable special redemption price set forth in the form of Bonds of 2005 Series in Section 3 of Article I of this Supplemental Indenture, together, in each case, with accrued interest to the redemption date.

The "special" redemption price is set at 100% of the par value of the bond, whereas the "regular" price list provides a descending premium upon redemption, starting at 106.88% of par if redeemed during the 12 month period beginning March 1, 1985 and decreasing incrementally to 100% of par if redeemed during the 12 month period beginning March 1, 2004.

The Improvement Fund is established in Section 1, Article IV of the 1975 Supplemental Indenture (the indentures of prior series of bonds establish separate Improvement Funds for each bond series) which calls for UE to pay to the Trustee each year, beginning in 1977, "a sum in cash equal to one percent" of the principal amount of outstanding Series 2005 Bonds. The section further provides that UE may satisfy the 1% Improvement Fund deposit—"the Company may credit against such Improvement Fund"—with certain property additions in lieu of cash. Until the deposit of $700,000 cash for the Series 2005 Improvement Fund in 1978, UE had never deposited cash to satisfy the Fund for any series of its bonds but had always utilized property credits instead.

There is only one Maintenance Fund for the benefit of all outstanding series of bonds. The 1941 Supplemental Indenture created it, but the 1958 Supplemental Indenture made some changes in the Maintenance Fund provisions. The 1975 Supplemental Indenture states that satisfaction of the 1958 Maintenance Fund requirements shall be deemed full compliance with the 1941 Indenture terms. UE is required each year to deposit with the Trustee for the Maintenance Fund an amount of cash, referred to as the "basic replacement requirement," equal to fifteen percent (15%) of the gross operating revenues of the company

for the preceding year, less the total amount spent by the company for maintenance and repairs and the amount of the Improvement Fund required to be paid under the 1941 Indenture. There is also an "additional replacement requirement" which may have to be deposited under certain circumstances. Instead of paying cash into the Maintenance Fund, the indentures provide that UE may elect to apply certain credits, including property additions, if available. Prior to 1978, UE had always satisfied the Maintenance Fund requirements by electing to credit property additions instead of depositing cash with the Trustee.

UE asserts authority to effect a special redemption from cash deposited for the Maintenance Fund. The section of the 1975 Indenture which continues the Maintenance Fund does not mention redemptions. It does provide, however, that all cash paid in for the Maintenance Fund shall be held and applied as part of the trust estate. Another section provides that any cash held as part of the trust estate may be used to redeem bonds at UE's request. And yet a different section provides that a redemption shall be at "special" redemption prices.

Plaintiffs argue, though, that these provisions cannot be interpreted to permit redemptions directly from the Maintenance Fund cash.

Plaintiffs' amended petition sought a declaration that UE could not proceed with the contemplated redemption. But if it was decided that UE could redeem, plaintiffs also sought a determination that the selling Prospectus failed to adequately disclose the redemption features of the Series 2005 Bonds in violation of applicable securities laws. UE moved for a separate trial on the issue of whether in fact it did have the right under the Bond Mortgage and Deed of Trust, as supplemented by subsequent Supplemental Indentures, to redeem the bonds as it had planned. UE's motion for partial summary judgment sought judgment on that issue alone and did not address the Prospectus disclosures issue. However, plaintiffs' motion for summary judgment sought judgment on both questions. On December 28, 1979, the trial court entered its memorandum, order and decree granting plaintiffs' motion for summary judgment and denying UE's summary judgment motion. Concurrently, the court overruled UE's motion for separate trial of the contract issue. The court's decree, however, does not mention the Prospectus disclosure question, and we assume the court considered it moot in light of its ruling that the redemption right did not exist. However, our determination that UE does have the right to redeem under the bond contract, revives the issue of whether the Prospectus adequately disclosed the redemption possibilities. That issue, though, is not properly before us as the trial court did not reach it. Upon remand the trial court will have the opportunity to make its judgment on the adequacy of the Prospectus in the light of our holding.

In its memorandum, the trial court announced that in construing the indentures and Bond Contract it would give deference to the intentions of the parties in the light of existing law and circumstances. The court's decree included the following paragraph 14A:

1. No Series 2005 Bonds may be redeemed by Union Electric or St. Louis Union prior to March 1, 1985, if the monies for such redemptions are obtained by Union Electric, directly or indirectly from or in anticipation of borrowings by or for the account of Union Electric, the Improvement Fund for Series 2005 Bonds, the Maintenance Fund or the trust estate, at an effective interest cost (computed in accordance with generally accepted financial practices) of 10.60% per annum, or less; and

2. Neither the Maintenance Fund, Improvement Fund, or the trust estate shall be used as a vehicle for the general redemption of bonds nor as a device to circumvent the prohibition against refunding or the regular redemption prices; and

3. Any cash paid by Union Electric to the Maintenance Fund provided for in

Article IV of the 1975 Supplemental Indenture shall be only from its operating revenues and such payments, shall in no wise exceed 15% of the operating revenues of Union Electric annually, and shall be reduced by all non-cash credits available under the terms of the Indentures and as described in Section 5 of said Article IV; and

4. The bond redemption provisions of Article VIII, Section 8, of the Original Indenture, as amended by the May 1, 1941 Supplemental Indenture, (pertaining to the application of monies deposited with the Trustee in connection with releases of property or on account of damage or destruction of property) do not apply to monies held by the Trustee in, as a part of, or for the account of the Maintenance Fund or any Improvement Fund for bonds of any series; and

5. The Special Redemption Price of 100% of principal amount referred to in Section 3 of Article IV of the 1975 Supplemental Indenture applies only to cash received for the Improvement Fund as computed under the provisions of Section 1 of Article IV of the 1975 Supplemental Indenture and paid directly into said Fund by Union Electric; provided, however, that such payment shall in no wise exceed $700,000 per annum and shall be reduced by all non-cash credits then available under the terms of the Indentures. All other redemption of Bonds shall be at the Regular Redemption Prices set forth in Section 3 of Article 1 of the 1975 Supplemental Indenture.

UE raises numerous grounds for reversal of the trial court's decision. First, it is argued that because the underwriters were not parties to Counts I, II and IV, the case must be reversed as they were affected, interested, and indispensable parties. Second, UE complains that Counts I and II should have been dismissed because they are based on sections of federal securities laws that do not give rise to a private right of action. UE's third point alleges that the lower court should have declined to assume jurisdiction over the request for declaratory relief, because it "required a judicial investigation of disputed and complicated facts." The fourth allegation of error concerns the trial court's use of extrinsic evidence to interpret the bond contract—UE insists that the bond contract is written clearly and unambiguously, and consequently the parol evidence rule prohibits the consideration of extrinsic evidence in interpreting the meaning of the written language. UE's final point on appeal alleges *inter alia* that the decree "is unsupported by any recognized legal principles or admissible evidence," and that summary judgment for plaintiffs was erroneous because plaintiffs did not establish the construction the court gave to the bond contract by "unassailable proof" as required by Rule 74.04(h).

■ UE argues that the four managing underwriters, who negotiated and placed the Series 2005 Bond offering, should have been joined as parties in this proceeding. UE cites § 527.110, RSMo 1978: "When declaratory relief is sought, all persons shall be made parties who have or claim any interest which would be affected by the declaration, and no declaration shall prejudice the rights of persons not parties to the proceedings." It also asserts Rule 52.04(a) by reason of the underwriters' "interest."

Plaintiffs maintain that the underwriters do not have and do not claim an "interest" in the proceeding which would require joinder under § 527.110 or Rule 52.04(a)(2). The underwriters, in an *amicus curiae* brief filed with this court, also assert that they have no interest in the contract interpretation issue presented by Counts I, II and IV, and we agree.

It has been said that:

An "interest" which compels joinder does not include a mere consequential, remote or conjectural possibility of being in some manner affected by the result of the original action. It must be such a direct claim upon the subject matter of the action that the joined party will either gain or lose by direct operation of the judgment to be rendered.

*State ex rel. Emcasco Insurance Co. v. Rush*, 546 S.W.2d 188, 197 (Mo.App. 1977).

*See also Dick v. Shannon,* 596 S.W.2d 79, 84 (Mo.App. 1980). The underwriters will not be affected in such a direct manner as would require their joinder here. Any effect upon them is merely conjectural and consequential. Their liability for Prospectus disclosures is not the subject matter of this action and is not settled by this decision. In the Motion to Intervene in Counts I, II and IV filed by the underwriters with the trial court they asked to be made parties to those counts, or, *alternatively,* to sever the contract issue for separate trial. The underwriters' motion was effectively granted, even though the court purported to deny it, as the court's decree is in fact limited to the contract issue. Thus, the underwriters have been granted all the relief they requested and appear to be fully satisfied that they do not have an interest that has been prejudiced by the proceedings thus far.

The remaining question that UE has raised under Rule 52.04(a)(1) is whether the underwriters should be joined because in their absence "complete relief cannot be accorded among those already parties." A declaration of redemption rights of UE's Series 2005 Bonds provides complete relief on the contract issue when the bondholders and the company are parties, and participation of the underwriters would add nothing between UE and plaintiffs.

UE's second point on appeal is that insofar as the court's decree is based on Counts I and II it is improper because both counts should have been dismissed. UE asserts that the Trust Indenture Act of 1939, § 323(a) (15 U.S.C. § 77 www), upon which Count I is based, does not provide a cause of action regarding disclosure of redemption provisions in a trust indenture. And even if it does, UE raises a statute of limitations defense. Also, UE maintains that Count II, based upon the Securities Act of 1933, § 17(a) (15 U.S.C. § 77q), should have been dismissed, because there is no private right of action under § 17(a). *Shull v. Dain,*

*Kalman & Quail, Inc.,* 561 F.2d 152, 159 (8th Cir. 1977), *cert. denied,* 434 U.S. 1086, 98 S.Ct. 1281, 55 L.Ed.2d 792 (1978).[3] Because the trial court did not reach the merits of the disclosure claims, we need not decide this issue now. The decree only interprets the bond contract and declares the rights of the parties. Count IV alone adequately requested such declaratory relief. Upon remand, the trial court will have the opportunity to explore fully whether the securities laws claims of Counts I and II are properly before it.

■ UE next contends that the trial court should have declined to enter a declaratory judgment under Count IV because it required a "judicial investigation of disputed and complicated facts," citing 22 Am. Jur.2d 862–63. However, our review of the record reveals few facts that are disputed and relevant to the interpretation of the bond contract. Indeed, the decree is almost entirely the court's opinion of the legal effect of undisputed facts. The trial court did not abuse its discretion by deciding that the contract issue was appropriate for declaratory judgment. *See Missouri Property Insurance Placement Facility v. McRoberts,* 598 S.W.2d 146, 148 (Mo.App. 1978); *State Farm Fire & Casualty Co. v. Powell,* 529 S.W.2d 666, 668 (Mo.App. 1975); Rule 87.07, Mo.R.Civ.P.

■ UE's fourth allegation of error concerns the admission of extrinsic evidence in interpreting the redemption features of the Series 2005 Bonds. UE argues that the Bond Contract consists of plain and unambiguous printed instruments embodying the parties' entire agreement; consequently, the parol evidence rule prohibits the introduction of any extraneous evidence and the parties' intentions must be determined solely from those instruments. As this was a summary judgment decision, no evidence was "admitted" by the court. But, in any event, the parol evidence rule provides only that parol evidence may not be used to vary or contradict the terms of a complete and

---

**3.** The court noted that in *Greater Iowa Corp. v. McLendon,* 378 F.2d 783, 788–90 (8th Cir. 1967), it had held that the private right of action must be found in § 12(2) of the Securities Act of 1933 and not in § 17(a). *Id.* at 155.

unambiguous written contract absent fraud, common mistake, accident or erroneous omission. *Craig v. Jo B. Gardner, Inc.,* 586 S.W.2d 316, 324 (Mo.banc 1979). Collateral facts and circumstances may be introduced to ascertain the subject matter of the contract and to aid in its interpretation, but such facts cannot cause the court to read into the contract something that it does not say, create an ambiguity or show an obligation other than expressed in the written instrument. *Id.*

■ We conclude that the written instruments comprising the Bond Contract constitute an integrated agreement, *i.e.,* the bond certificate, the Original and Supplemental Indentures, were intended to be a complete recitation of all items and conditions applicable to the Series 2005 Bonds. With this type of instrument, particular care must be taken to ensure that the entire agreement is reduced to writing as it will govern the rights of bondholders who generally take no part in the formulation of the Indentures and therefore are not apprised of any unwritten understandings or provisos concerning the terms of the agreement.

■ Both parties contend that the Bond Contract is unambiguous—UE asserts that it clearly means one thing, while plaintiffs insist it means another. However, mere disagreement over the meaning of the Contract does not signal an ambiguity. *Crim v. National Life and Accident Insurance Co.,* 605 S.W.2d 73, 76 (Mo.banc 1980); *J. E. Hathman, Inc. v. Sigma Alpha Epsilon Club,* 491 S.W.2d 261, 264 (Mo.banc 1973); *Grantham v. Rockhurst University,* 563 S.W.2d 147, 150 (Mo.App. 1978). Whether the language is ambiguous or not is a question of law for the court. An ambiguity exists when there is more than one reasonable interpretation which can be gleaned from the contract language. *Id.* The trial court concluded after considering the surrounding circumstances that there was only one reasonable interpretation of the contract.

In *Cure v. City of Jefferson,* 380 S.W.2d 305, 310–11 (Mo. 1964), the standards of the Restatement of the Law of Contracts were applied to interpret a disputed contract. Sections 230 and 235 of the Restatement specifically set forth the guidelines for construing an integrated agreement and allow consideration to be given to attending circumstances. Given the principles applied in *Cure v. City of Jefferson,* we cannot say that the trial court erred because it went beyond the words of the instruments and considered the surrounding circumstances. The authorities make it apparent, however, that it is error to use parol evidence to vary, contradict, modify, enlarge, or curtail the terms of an agreement that on its face is free from ambiguity. The court's decree reflects this error.

The circumstances surrounding the formation of the written instruments are essentially non-disputed. The Series 2005 Bonds were a negotiated issue, with the managing underwriters advising what the coupon rate and terms should be in order to successfully market the bonds. UE's prior series of bonds were subject to redemption by UE in whole or in part at any time before maturity upon thirty days' notice and payment of a premium above par. UE was advised that because of fluctuating interest rates and uncertain conditions in the investment market, a coupon rate of 10½% would probably also have to feature a ten year "no-call" (non-redemption) provision. If this provision was not included, then it was considered that 10¾% should be the minimum rate, and even then there could be no guarantee of successful placement. UE was further told that a five year "no-call" period would not suffice. Thus, a third paragraph was added to § 1, Article III, of the 1975 Supplemental Indenture—this is the section that generally provides for the redemption of bonds at premium prices—to restrict UE's redemption privilege:

Irrespective of the provisions of this Section 1, Bonds of 2005 Series shall not be redeemable at the option of the Company at any time prior to March 1, 1985 (*other than by the operation of the Improvement Fund or the Maintenance Fund provided in Article IV of this Supplemental Indenture or pursuant to Sec-*

*tion 8 of Article VIII of the Original Indenture*) if moneys for such redemption are obtained by the Company directly or indirectly from or in anticipation of borrowings by or for the account of the Company at an effective interest cost (computed in accordance with generally accepted financial practice) of 10.60% or less per annum. [emphasis added].

As mentioned, UE had never satisfied Improvement Fund or Maintenance Fund requirements with cash and consequently no redemptions had ever been made "by the operation of" those funds.

■ Plaintiffs argue that the third paragraph of § 1, Article IV, of the 1975 Indenture should be read to mean effectively: "No redemptions of any kind if the funds for it were obtained at less than 10.6% interest." We note initially that bondholders are charged with knowledge of the contents of the trust indenture where the bond certificate refers to the terms of the indenture. *Rothschild v. Jefferson Hotel Co.*, 56 F.Supp. 315, 318 (E.D.Mo. 1944); *Muren v. Southern Coal & Mining Co.*, 177 Mo.App. 600, 605, 160 S.W. 835, 836 (1913). Not only does the reverse side of UE's Series 2005 Bond Certificate refer to the indenture, it gives a brief explanation of the redemption features.

■ The first paragraph of the 2005 Bond Certificate is structured similarly to the third paragraph of § 1, Article IV, 1975 Indenture. It contains the parenthetical clause "otherwise than for the Improvement Fund hereinafter mentioned or upon application of moneys included in the trust estate." We believe this language serves to clarify that there are two distinct categories of redemptions, "special" and "regular", but that the "specials"—*i.e.*, those for the Improvement Fund or upon application of moneys included in the trust estate—are not subject to the restriction on lower interest cost refunding. Plaintiffs' argument that a parenthetical only modifies language preceding it and cannot modify any clauses following it would leave the parenthetical without discernable meaning. Furthermore, the paragraph following the paren-

thetical provides that special redemptions may commence in 1975 or 1977 but makes no mention of the restriction prior to 1985. A precept of contract construction is that, if possible, a court will give effect to all parts of an instrument, and a construction that gives a reasonable meaning to all its provisions will be preferred to one that leaves a portion of the writing useless or inexplicable. *E.g., Yamnitz v. Polytech, Inc.*, 586 S.W.2d 76, 80 (Mo.App. 1979). In light of the foregoing, we conclude that the Bond Contract's restriction on redemptions with borrowed funds does not apply to special redemptions, and the language is unambiguous on its face concerning this point.

The question remains whether the extrinsic evidence can create an ambiguity and provide another possible interpretation to this otherwise clear language. We believe not. Plaintiffs argue that they thought they were getting "solid" protection against lower interest cost refunding and that UE's top executives were under the same impression. Thus, we should ascribe that meaning to the language. However, plaintiffs' understanding of the redemption protection is found largely on the fact that special redemptions had never been pursued in the past. And, basically, plaintiffs assumed that they would not be done in the future. UE's executives simply admit that they were not aware of the possibility of a special redemption. It was not until another public utility company announced its plans for a redemption that UE decided to explore the possibility of redemption in a similar manner. These circumstances cannot alter the clear import of the written instrument. If *absolute* protection from lower interest cost redemption for ten years was intended, as plaintiffs contend, the indenture would have been so drafted. Instead, the bonds were merely subject to a limited risk of special redemption—limited in the sense that the amount of bonds redeemable cannot exceed the 1% Improvement Fund deposits and the replacement requirements of the Maintenance Fund. The extrinsic evidence does not convince us that the otherwise unambiguous language is susceptible

of any other reasonable interpretation, and we conclude as a matter of law that the Bond Contract's lower interest cost refunding restriction does not apply to special redemptions. To the extent the trial court's decree reflects a contrary view, and it does at various points, it is in error.

■ The next issue is whether redemptions can be made directly out of cash that has been deposited with the Trustee to satisfy Maintenance Fund requirements. UE asserts that the indentures permit this because § 5, Article IV, of the 1975 Indenture, which continues the Maintenance Fund, while not mentioning redemption, does state: "All cash received by the Trustee for the Maintenance Fund pursuant to this Section 5 shall be held and applied as part of the trust estate...."[4] And § 8, Article VIII, of the Original Indenture, dealing with the "Application of Moneys received by the Trustee", provides that:

> Any moneys held by the Trustee as part of the trust estate (other than moneys held on account of prior lien bonds or judgment liens), and not paid over to the Company pursuant to other provisions of this Article VIII, shall, at the election and in accordance with the request of the Company, evidenced by a certified resolution, be applied by the Trustee from time to time to the purchase of Bonds outstanding hereunder (of such series and within such limitations as to price as may be specified in the resolution) or to the redemption of such Bonds in accordance with the terms thereof....

Under the foregoing, UE asserts authority to make a cash deposit to the Maintenance Fund, and because that cash is held and applied as a part of the trust estate, it may elect to apply it to redeem such series of bonds as it chooses. Such redemption, because it is accomplished "pursuant to Section 8 of Article VIII of the Original Indenture," is at the special redemption price. *See* Section 3, Article IV, of the 1975 Supplemental Indenture set out *supra.*

Plaintiffs disagree and argue that these provisions cannot be construed to permit a redemption directly from Maintenance Fund cash. They contend that, in effect, such cash must be held as a "trust within a trust", and cannot be used for debt retirement purposes, that cash paid into the Maintenance Fund must come from operating revenues, not borrowed funds; that if property addition credits can reduce cash payment obligations such credits must be used because of UE's custom to do so.

We agree with UE's explanation of the indenture provisions. Section 5 of Article IV (*see* note 4, *supra*) clearly says that such cash shall be held as part of the trust estate. It gives no indication that it is to be a trust within a trust. Plaintiffs' argument that such cash *must* be added to Improvement Funds for any prior series bonds if not otherwise paid over to the Company is unconvincing. Payment over to the Improvement Funds is plainly an "election of the Company."

■ However, notwithstanding our conclusion that the language of the indentures permits the use of Maintenance Fund cash for redemptions, plaintiffs urge us to find that doing so would violate the intended purpose of the Maintenance Fund, which is obviously to maintain the value of the mortgaged property. While such funds are not generally viewed as debt-retirement funds, there is precedent for allowing the funds to be put to that purpose, provided the particular trust indenture allows it.

---

4. The complete paragraph provides:

All cash received by the Trustee for the Maintenance Fund pursuant to this Section 5 shall be held and applied as part of the trust estate, and shall be paid over from time to time to the Company upon compliance with Section 1 or Section 3 of Article VIII of the Original Indenture or Section 6 of this Article IV or Section 6 of Part IV of the Supplemental Indenture of May 1, 1941 or Section 6 of Article IV of any of the Supplemental Indentures creating prior series of Bonds, or, if not so paid over within one year from the date of such deposit, and not added to the improvement funds for Bonds of prior Series as provided in the respective Supplemental Indentures creating such series, shall, at the election of the Company, be added to the Improvement Fund for Bonds of 2005 Series provided for in Section 1 of this Article IV.

For example, *Gourielli's Estate v. Commissioner*, 289 F.2d 69, 72 (2d Cir. 1961), *rev'd sub nom. on other grounds, Hanover Bank v. Commissioner*, 369 U.S. 672, 82 S.Ct. 1080, 8 L.Ed.2d 187 (1962), and *Parnell v. United States*, 187 F.Supp. 576, 578 (M.D. Tenn. 1958), while not involving actual redemption, did recognize a utility's right to use a maintenance fund to do so.

Next is plaintiffs' contention that any cash deposited with the Trustee for Maintenance Fund purposes must have come directly from operating revenues and cannot be borrowed money. This assertion is based on the language of the indenture which describes the fund requirements in terms of a percentage of gross operating revenues, that is, "an amount of cash (herein sometimes referred to as the 'basic replacement requirement') equal to fifteen percent (15%) of the gross operating revenues of the Company ...." We believe, however, that this language only defines the amount and not the source of the cash. Our view is bolstered by the next clause which describes an additional deposit that may be necessary as:

> [A]n additional amount of cash (herein sometimes referred to as the "additional replacement requirement") equal to the amount, if any, by which the product of the applicable percentage (as hereinafter defined) and the arithmetical average of the amounts of depreciable property (as hereinafter defined) at the beginning and at the end of such preceding calendar year exceeds the basic replacement requirement ....

While the above clearly is a mouthful, it also is clear that it describes an amount of cash and does not delineate the source of such cash. It would be unreasonable to read into the indenture a restriction against using borrowed cash to satisfy the requirements. Neither the language of the indentures nor the attendant circumstances convinces us that the bond contract, as a matter of law, restricts the source of cash for the Maintenance Fund. To the extent the trial court's decree holds otherwise, it is erroneous.

A further question concerns the use of available property credits toward satisfaction of the Improvement and Maintenance Funds. The indentures provide that in lieu of the cash requirements UE may, at its election, credit certain property additions instead. Using the available credits had always been UE's practice, which, according to plaintiffs, restricts UE to its past practices. But plaintiffs ignore the manifest language of the indentures that gives UE the *option* to use credits instead of cash. Plaintiffs have cited numerous cases recognizing the doctrine that customs and usages may by implication become part of a contract. *E.g., City of Webster Groves v. Institutional and Public Employees Union*, 524 S.W.2d 162, 167 (Mo.App. 1975). However, custom and usage may be used only to remove ambiguities, not to contradict the plain meaning of a written contract. *Heiden v. General Motors Corp.*, 567 S.W.2d 401, 404–05 (Mo.App. 1978). We hold that UE has the right to elect whether or not to use available property credits against the Improvement Fund or Maintenance Fund requirements.

Plaintiffs have argued that the third paragraph of § 3, Article IV, of the 1975 Indenture[5] supports their contention that

---

5. The paragraph reads:

All Bonds of 2005 Series delivered to the Trustee in lieu of cash or redeemed by operation of the Improvement Fund for Bonds of 2005 Series in accordance with the provisions of this Article IV, shall forthwith be cancelled by the Trustee and shall be delivered to the Company. Bonds of 2005 Series so cancelled shall not be reissued, and, so long as any Bonds of 2005 Series are outstanding, no additional Bonds shall be authenticated and delivered in substitution for Bonds of 2005 Series so cancelled or in substitution for

Bonds of [prior series] delivered to the Trustee in lieu of cash otherwise payable into the improvement funds for any of such series, or redeemed by operation of such funds, in accordance with the provisions with respect to the operation of such funds contained in the Supplemental Indentures [creating prior series Bonds], and no cash included in the trust estate shall be withdrawn, nor shall the amount of cash required to be paid into the trust estate under any provision of the Original Indenture, the Supplemental Indentures creating prior series of Bonds or this Supple-

lower interest cost refunding is absolutely prohibited. The reasonable interpretation of this paragraph is that if UE desires to replace such cancelled bonds with another issue of bonds, it must properly authenticate the new bonds, *i.e.*, it must deliver to the Trustee an additional amount of property to become subject to the mortgage. The property that originally served as the basis for authentication of the retired bonds is not released from the mortgage. In other words, the new bonds cannot be issued simply "in substitution" for the retired bonds; they must be "in addition" to them.

We hold in accordance with the foregoing discussion that the court erred in granting plaintiff's motion for summary judgment and that as a matter of law UE's motion for partial summary judgment should have been granted.

Our conclusions mandate extensive modifications to the trial court's declaration of contractual redemption features. We shall discuss each of the five sub-paragraphs of paragraph 14A of the decree (fully set out *supra*):

1. The restriction on the use of funds borrowed at less than 10.6% does not apply to redemptions from Improvement Fund cash or via Article VIII, § 8, of the Original Indenture, which includes cash deposited with the Trustee for the Maintenance Fund requirements.

2. This paragraph is somewhat cryptic in that it proscribes using the Maintenance or Improvement Funds for the "general redemption" of bonds. We note, though, that the amount of bonds that may be specially redeemed by the Improvement or Maintenance Funds at any one time is limited to the amount of cash that remains on deposit with the Trustee for such funds. If UE desires to redeem more bonds than the Trustee holds the cash for, such excess

amount must be redeemed at the regular redemption price and in accordance with any applicable restrictions on regular redemptions.

3. Cash for the Maintenance Fund does not have to come from operating revenues and the only mandatory credit is the amount spent for maintenance and repairs.[6] Also, the Maintenance Fund requirement conceivably may exceed 15% of operating revenues if an "additional replacement requirement" is necessary under Article IV, § 5, 1958 Supplemental Indenture.

4. The bond redemption provisions of Article VIII, § 8, of the Original Indenture do apply to cash deposited with the Trustee pursuant to Maintenance Fund requirements. That section, of course, does not apply to Improvement Fund deposits as they are not held as part of the trust estate.

5. The special redemption price can apply only to cash paid directly into the Improvement Fund by UE but, as plaintiffs have mentioned, may apply also to cash that is first deposited for the Maintenance Fund and then transferred to the Improvement Fund pursuant to Article IV, § 5, par. 2, 1975 Supplemental Indenture. The non-cash credits to the Improvement Fund are not mandatory. Furthermore, as long as the cash has been properly deposited into the Improvement Fund, we see no reason why there should be a limit on the amount of cash that may be expended for redemption in any one year. The special redemption price also applies to the redemptions via § 8, Article VIII, of the Original Indenture, including cash in the trust estate pursuant to Maintenance Fund requirements.

We emphasize that our determination of the redemption features under the bond contract has not taken into consideration the Prospectus applicable to the Series 2005 Bonds.[7] Upon remand the trial court will

---

mental Indenture be reduced, on the basis thereof.

**6.** The 1958 Supplemental Indenture makes maintenance and repairs a mandatory credit but is an elective credit in the Original Indenture.

**7.** There is some suggestion in the pleadings, but no party has urged it in the briefs, that a mutual mistake concerning the proper interpretation of the bond contract may be involved here. We have concluded, however, that such a theory of relief would not be appropriate

have the opportunity to determine whether the Prospectus disclosure issues are properly before it, and, if so, to determine the adequacy of such disclosure with regard to the redemption features of the Series 2005 Bonds.

Reversed and remanded for further proceedings in accordance with this opinion.

PUDLOWSKI, P. J., and WEIER, J., concur.

considering the procedural stance of this case and that the Prospectus and disclosure issues

are not properly before us.