Harold **HARRIS**, et al., Appellees,

v.

**UNION ELECTRIC COMPANY, Appellant.**

No. 85–1252.

United States Court of Appeals, Eighth Circuit.

Submitted Oct. 16, 1985.

Decided March 24, 1986.
Rehearing and Rehearing En Banc Denied May 2, 1986.

Francis X. Duda, St. Louis, Mo., for appellant.

David L. Campbell, St. Louis, Mo., for appellees.

Before ARNOLD, Circuit Judge, FLOYD R. GIBSON, Senior Circuit Judge, and FAGG, Circuit Judge.

FLOYD R. GIBSON, Senior Circuit Judge.

Harold Harris, Continental Casualty Company, and National Fire Insurance Company of Hartford, individually and on behalf of a class of bondholders, brought this action against Union Electric Company alleging violations of section 10(b) of the Securities Exchange Act and of Rule 10b–5 of the Securities Exchange Commission with respect to the issuance and proposed call of the First Mortgage Bonds of Union

Electric Company. The district court [1] entered judgment on a jury verdict awarding the class $2,716, 240. Union Electric Company appeals, and for reversal it argues that 1) the plaintiffs' claims are barred by the statute of limitations; 2) insufficient evidence exists to sustain the jury's verdict on the plaintiffs' section 10(b) and Rule 10b–5 claims; 3) the court erroneously instructed the jury with respect to liability and damages; and 4) the court erroneously excluded evidence regarding market value and interest payments made after the plan to call the bonds was cancelled. For the reasons discussed below, we affirm the district court's judgment.

## I. BACKGROUND

In March of 1975, Union Electric Company (UE) issued $70,000,000 of its First Mortgage Bonds, 10½ Series due March 1, 2005 pursuant to a Supplemental Indenture. The bonds had a par value of $1,000, and were sold to a group, or syndicate, of eighty-eight underwriters, who offered the bonds to the public. By April 9, 1975, all of the bonds had been sold to the public, and the syndicate was dissolved. Harris purchased twelve bonds at 100% of par, or a total price of $12,000. Continental purchased 1,000 bonds in two transactions— 500 bonds at 98.25% of par, or $491,000, and 500 bonds at 102% of par, or $510,000. National purchased 3000 bonds in three transactions—1,000 bonds at 100.55% of par, or $1,005,000, 1,500 bonds at 100.5625%, or $1,508,437.50, and 500 bonds at 100.25%, or $501,250.

On April 11, 1978, UE publicly announced its plan to call $50,000,000 of the Series 2005 Bonds. As a result of the announcement, the market value of the bonds plunged from approximately 113 to 101, or $120 per bond. To implement the plan, UE incurred short-term debt of $49,887,000 in cash at an interest rate of less than 10.60%, which it deposited with its mortgage trustee; $49,187,000 was placed

---

**1.** The Honorable William L. Hungate, United States District Judge for the Eastern District of Missouri.

in UE's Maintenance Fund and $700,000 was placed in its Improvement Fund. The short-term debt was to be replaced by a private placement of a long-term mortgage bond issue at 9.35%. Although UE instructed the trustee to call the Series 2005 Bonds, the trustee refused to do so without judicial approval because it questioned the legality of the plan to call the bonds through the Maintenance Fund. On May 9, 1978, the plaintiffs in this suit instituted a state court action in the Missouri State Circuit Court against UE and its trustee, seeking injunctive and declaratory relief. The purchasers of the 9.35% bonds (the bonds that were to be sold to replace the short-term debt) refused to buy when they learned of the state court action. Consequently, on June 19, 1978, UE abandoned its plan, and withdrew the cash from the Maintenance Fund. In December of 1979, the Missouri Circuit Court granted the plaintiffs' motion for summary judgment. The Missouri Court of Appeals reversed, construing the indentures and the bond contract to allow UE to call the Series 2005 Bonds as it had planned. *Harris v. Union Electric Co.*, 622 S.W.2d 239, 246–50 (Mo. Ct.App.1981). The court of appeals did not rule on the issue of whether the prospectus for the Series 2005 Bonds adequately disclosed the bonds' call protection because it held that issue was not properly before the court. *Id.* at 244. The prospectus, however, as well as the plan, is the subject of the present action, which the plaintiffs instituted in the federal district court on February 11, 1980.

The plaintiffs' amended complaint alleged violations of section 10(b) of the Securities Exchange Act, 15 U.S.C. § 78j (b) (1982), and Rule 10b–5 of the Securities Exchange Commission, 17 C.F.R. § 240.-10b–5 (1985). Specifically, the plaintiffs claimed that the prospectus for the Series 2005 Bonds misrepresented and omitted material facts regarding the call-protection provisions of the bond contract, and that the attempted plan to call the bonds constituted a scheme to defraud the bondholders because UE knew the plan was "contrary to and prohibited by the terms of the pro-spectus." The district court certified the class pursuant to Fed.R.Civ.P. 23(b)(3). The court's amended definition of the class included "[a]ll persons, companies, and corporations who held First Mortgage Bonds of Union Electric Company, 10½% Series, due March 1, 2005, as of the public redemption announcement by Union Electric Company on April 11, 1978." The class consisted of 1,500 bondholders, holding a total of 67,906 bonds. After a bifurcated trial on the issues of liability and damages, the jury returned verdicts in favor of the plaintiffs, awarding them $2,716,240. The court entered its judgment in accordance with the verdicts, and UE appealed.

## II. DISCUSSION

### A. Statute of Limitations

UE contends that the plaintiffs' claims are barred by the two-year statute of limitations set forth in section 409.411(e) of the Missouri Revised Statutes. UE argues that the claims are untimely because this action was commenced five years after the bonds were sold, and three years after several plaintiffs learned of a "similar plan" implemented by Florida Power & Light Company (FP & L). Although UE correctly identifies the appropriate statute of limitations, its argument must fail. In *Morris v. Stifel, Nicolaus & Co.*, 600 F.2d 139, 146 (8th Cir.1979), the court held that section 409.411(e) is the appropriate statute of limitations for section 10(b) and Rule 10b–5 actions commenced in Missouri federal courts. It is well established, however, that the limitations period is tolled until the fraud is discovered or, upon reasonable inquiry, when it should have been discovered. *Id.* at 140 n. 7 (citing *Vanderboom v. Sexton*, 422 F.2d 1233, 1240 (8th Cir.), *cert. denied*, 400 U.S. 852, 91 S.Ct. 47, 27 L.Ed.2d 90 (1970)). *See also Koke v. Stifel, Nicolaus & Co.*, 620 F.2d 1340, 1343 (8th Cir.1980). Although the bonds were sold in 1975, the plaintiffs did not discover the fraud until UE announced its plan to call the bonds on April 11, 1978. Furthermore, in these circumstances, a reasonable person holding UE's Series 2005 Bonds

would not have discovered the fraud simply by learning in 1977 that FP & L announced a plan to redeem similarly issued bonds. Indeed, several experts, including several UE officials, were not aware of the possibility of UE employing such a plan with respect to the Series 2005 Bonds until long after FP & L implemented its plan. Therefore, we hold that the plaintiffs' action is not barred by the statute of limitations.[2]

### B. Rule 10b–5

The plaintiffs' amended complaint alleged that UE's conduct violated section 10(b) and Rule 10b–5 in two respects, which they describe as disclosure fraud and transaction fraud. First, UE committed disclosure fraud when it misrepresented and omitted material facts in its prospectus concerning redemption and refunding rights. Second, UE engaged in a course of business and employed a device, scheme, or artifice to defraud, constituting the transaction fraud, when it borrowed funds at an interest rate lower than 10.60%, deposited the funds in the Maintenance Fund, instructed the trustee to call the Series 2005 Bonds, and publicly announced its plan to call the bonds, causing the market price of the bonds to plummet.

UE contends that the evidence was insufficient to support a jury verdict for damages pursuant to Rule 10b–5 because no probative evidence was submitted to establish materiality, reliance, damages, or scienter with respect to the class in general, and specifically, with respect to those members who held bonds on April 11, 1978 (the date the plan was announced), but who did not purchase their bonds in 1975.[3] UE argues that the plaintiffs' proof that UE officials were unaware of the possibility of calling the bonds until 1977, after FP & L implemented its plan, negates any allegation of scienter at the time the bonds were issued in 1975. UE claims that it could not have made a conscious effort to mislead investors in 1975 about the possibility of a plan that it was unaware existed until 1977. UE also argues that the plaintiffs failed to establish materiality. Although evidence was submitted showing that call-protection provisions in general are material, UE contends that the plaintiffs failed to show that an otherwise worded provision in the prospectus would have caused an average buyer to make a different investment decision. In fact, it is UE's position that the prospectus clearly disclosed UE's right to call the bonds in the manner in which the plan provided. It is also UE's position that those members of the class who held bonds on the date the plan was announced, but who did not purchase their bonds in 1975, could not have relied on the misrepresentations and omissions of material fact allegedly made by UE in 1975. Therefore, UE argues, those members could not prove fraudulent conduct, materiality, or reliance. UE also contends that the class members as well as the named plaintiffs were not damaged. UE argues that because the plan was cancelled before any bonds were selected for call, bondholders did not sustain a loss. The evidence showing that the market value of the bonds dropped twelve points after the plan was announced, but

---

2. UE also contends that the court's amended definition of the class erroneously operated retroactively to include parties and claims otherwise barred by the two-year statute of limitations. The district court has "broad discretion in determining whether a class action may be maintained, and its determination will not be overturned absent a showing that it abused that discretion." *Shapiro v. Midwest Rubber Reclaiming Co.*, 626 F.2d 63, 71 (8th Cir.1980), *cert. denied*, 449 U.S. 1079, 101 S.Ct. 860, 66 L.Ed.2d 802 (1981). In *American Pipe & Construction Co. v. Utah*, 414 U.S. 538, 551, 94 S.Ct. 756, 765, 38 L.Ed.2d 713 (1974), the Court stated that "the commencement of the action satisfied the purpose of the limitation provision as to all those who might subsequently participate in the suit as well as the named plaintiffs." We hold that the claims of those members who were subsequently added to the class as a result of the court's redefinition are not barred by the statute of limitations because the named plaintiffs commenced the action within the applicable time period.

3. With the few exceptions that we address in our discussion, UE's arguments under its first, second, and third brief points can be characterized as challenging the sufficiency of the plaintiffs' evidence to prove their section 10(b) and Rule 10b–5 claims.

before it was cancelled, does not measure a loss by the bondholders.

■ Our review of these issues is governed by the "sufficiency of the evidence" standard. Factual issues determined by the jury will not be reversed by this court when the verdict is supported by substantial evidence in the record. *See Mizell v. United States,* 663 F.2d 772, 776 (8th Cir. 1981); *Ozark Airlines, Inc. v. Larimer,* 352 F.2d 9, 11 (8th Cir.1965). Although the plaintiffs argue that two separate instances of fraud exist—disclosure fraud and transaction fraud—we hold that the evidence is sufficient for the jury to have found that UE's entire conduct from March, 1975 to April, 1978 concerning the Series 2005 Bonds constituted a course of business and scheme or artifice which operated as a fraud on the bondholders.

■ Pursuant to section 10(b) of the 1934 Securities Exchange Act, the Securities Exchange Commission promulgated Rule 10b–5, which proscribes fraudulent conduct in connection with the purchase or sale of securities. *See St. Louis Union Trust Co. v. Merrill Lynch, Pierce, Fenner & Smith, Inc.,* 562 F.2d 1040, 1047 (8th Cir.1977), *cert. denied,* 435 U.S. 925, 98 S.Ct. 1490, 55 L.Ed.2d 519 (1978).[4] To succeed in a private action pursuant to Rule 10b–5, a plaintiff must establish 1) that the defendant acted in a manner prohibited by the Rule, whether it be that the defendant employed a device, scheme, or artifice to defraud, made misrepresentations or omis-

sions of material fact, or engaged in acts, practices, or courses of business that operate as a fraud or deceit; 2) causation, often analyzed in terms of materiality and reliance; 3) damages; and 4) that the fraudulent activity occurred in connection with the purchase and sale of a security. *See Austin v. Loftsgaarden,* 675 F.2d 168, 176–80 (8th Cir.1982); 17 C.F.R. § 240.10b–5 (1985). A finding of scienter, that is, an "intent to deceive, manipulate, or defraud," is also a prerequisite to recovery under section 10(b) and Rule 10b–5. *Ernst & Ernst v. Hochfelder,* 425 U.S. 185, 193, 96 S.Ct. 1375, 1381, 47 L.Ed.2d 668 (1976).

### 1. Prohibited Conduct

The plaintiffs contend that UE's conduct with respect to the prospectus violated Rule 10b–5(b). It is the plaintiffs' position that the redemption provisions in the prospectus provide an absolute ban on lower cost refunding before March 1, 1985. The plaintiffs argue that these provisions misrepresent or omit material facts concerning the call protection and redemption rights set forth in the bond contract. The applicable provisions of the prospectus provide:

The New Bonds are redeemable, at the option of the Company, at the redemption prices set forth herein, provided that, prior to March 1, 1985, the Company may not redeem any of the New Bonds (other than through the Improvement Fund or by the application of certain moneys in the Maintenance Fund or

---

**4.** Section 10 provides:

It shall be unlawful for any person, directly or indirectly, by the use of any means or instrumentality of interstate commerce, or of the mails or of any facility of any national securities exchange—

* * * * * *

(b) To use or employ, in connection with the purchase or sale of any security registered on a national securities exchange or any security not so registered, any manipulative or deceptive device or contrivance in contravention of such rules and regulations as the Commission may prescribe as necessary or appropriate in the public interest or for the protection of investors.

15 U.S.C. § 78j(b) (1982). Rule 10b–5 provides:

It shall be unlawful for any person, directly or indirectly, by the use of any means or instrumentality of interstate commerce, or of the mails or of any facility of any national securities exchange,

(a) To employ any device, scheme, or artifice to defraud,

(b) To make any untrue statement of a material fact or to omit to state a material fact necessary in order to make the statements made, in the light of the circumstances under which they were made, not misleading, or

(c) To engage in any act, practice, or course of business which operates or would operate as a fraud or deceit upon any person, in connection with the purchase or sale of any security.

17 C.F.R. § 240.10b–5 (1985).

otherwise in the trust estate) from or in anticipation of funds borrowed having an interest cost to the Company of less than 10.60% per annum. (This provision is located on the cover page of the prospectus.)

Redemption
Provision........Non-refundable, otherwise than through the Improvement Fund or by the application of certain moneys in the Maintenance Fund or otherwise in the trust estate, at a lower interest cost prior to March 1, 1985 (page 3 of the prospectus)

**Redemption.** The New Bonds are to be redeemable in whole or in part upon at least 30 days' notice, at the election of the Company, at the applicable Regular Redemption Prices set forth in the following table, expressed in each case in percentages of principal amount, and at a Special Redemption Price of 100% of their principal amount, together with interest accrued to the redemption date; provided, however, that the New Bonds may not be so redeemed at the Regular Redemption Prices prior to March 1, 1985 if moneys for such redemption are obtained by the Company, directly or indirectly, from or in anticipation of borrowings by or for the account of the Company at an effective interest cost (computed in accordance with generally accepted financial practice) of 10.60% or less per annum. Regular Redemption Prices apply to all redemptions except in the following cases to which the Special Redemption Price will apply: (a) redemptions for the Improvement Fund for the New Bonds, or (b) redemptions by application of cash in the Maintenance Fund or from certain other moneys included in the trust estate. (page 28 of the prospectus)[5]

**Improvement Fund.** So long as any New Bonds are outstanding, the Company will, on or before April 15 in each year beginning with 1977, provide an annual Improvement Fund for the New Bonds in an amount equal to 1% of the greatest principal amount of New Bonds issued prior to January 1 of such year,

less New Bonds retired by application of certain moneys included in the trust estate, which amount may either be paid in cash or satisfied (i) by delivery of New Bonds theretofore issued and outstanding, or (ii) by application thereto of 60% of the amount of Net Bondable Value of Property Additions not subject to an Unfunded Prior Lien which the Company elects so to use. Moneys paid into the Improvement Fund for the New Bonds are to be applied to the redemption of New Bonds. (March 1975) Supplementary Indenture, Art. IV.) Similar improvement funds are provided for Bonds of prior Series by the supplemental indentures under which such Bonds were issued, except that certain of such funds may be satisfied by application of 100% of the amount of Net Bondable Value of Property Additions not subject to an Unfunded Prior Lien which the Company elects so to use. (page 29 of the prospectus)

**Maintenance Fund.** So long as any New Bonds are outstanding, the Company is required, on or before April 15 in each year, to deposit with the Trustee an amount in cash equal to 15% of its Gross Operating Revenues for the preceding year (after certain deductions including expenditures for maintenance and repairs). Such deposit may be reduced by certain credits, including the amount of property retirements not in excess of property additions, any available balance of Net Bondable Value of Property Additions not subject to an Unfunded Prior Lien and the principal amount of Bonds retired (except out of trust estate moneys). Moneys paid into the Maintenance Fund may be added to any of the improvement funds for the New Bonds or Bonds of prior Series and applied to redemption of Bonds to which such improvement fund relates. (1941 Supplemental Indenture, Part IV, Sec. 5; March

---

5. Following this provision, on page twenty-eight of the prospectus, is a list of the "Regular Redemption Prices" for each year from 1975 to 2004, expressed in a percentage of par. The prices begin at a premium of 110.50% in 1975, and decrease to 100%, or par, in the year 2004.

1975 Supplemental Indenture Act, Art. IV, Sec. 5.) (page 29 of the prospectus)

The parties' arguments focus on the call-protection provision on the cover page of the prospectus. The plaintiffs interpret this provision as setting forth an absolute prohibition on lower cost refunding by UE. The plaintiffs contend that the parenthetical in that provision is an exception to the restriction on redeeming bonds before March 1, 1985. The plaintiffs argue that this exception does not apply, however, to the restriction that follows that parenthetical, the restriction on lower cost refunding. According to this interpretation, if UE wanted to call the bonds before March 1, 1985, it could not do so with funds borrowed at an interest rate of less than 10.60%, *even if* UE implemented the call through the Improvement or Maintenance Funds. UE argues, on the other hand, that the parenthetical is an exception to both the restriction on call that precedes the parenthetical, *and* the restriction that follows it. According to this interpretation, UE could not redeem the bonds before March 1, 1985 with funds borrowed at less than 10.60% *unless* UE did so through the Improvement or Maintenance Funds.

■ Although both the plaintiffs' and UE's interpretations of the cover-page provision are plausible, we do not limit our determination to this single provision. To the contrary, we consider the prospectus in its entirety, as we assume the jury did, together with the intentions of the parties. When the cover-page provision is read together with the redemption provisions on pages three and twenty-eight, and with the Improvement and Maintenance Fund provisions on page twenty-nine, it is clear that the jury could have reasonably found that the prospectus is ambiguous and misleading in that it omits material facts concerning the call protection. This finding is supported by the testimony of the purchasers, underwriters, and UE officials, all expressing the mutual intent of the parties that

the bonds would possess solid protection against call for ten years.

■ Article VIII, section 8 of the bond contract has been judicially construed by the Missouri Court of Appeals to authorize lower cost refunding at the special redemption prices. *Harris v. Union Electric Co.,* 622 S.W.2d at 251. The prospectus, however, does not mention Article VIII, section 8. The prospectus is misleading in that it does not adequately disclose the authorization set forth in section 8, while giving the impression that refunding the bonds at a lower rate of interest before March 1, 1985 is prohibited. The redemption provision on page twenty-eight of the prospectus prohibits lower cost refunding at the Regular Redemption Prices, and the bond contract allows such refunding at the Special Redemption price. This "protection" is a sham. The Regular Redemption Prices are premiums, but the Special Redemption Price is fixed at par. A restriction on lower cost refunding at a premium with no such restriction at par affords no meaningful protection against call. UE would never call the bonds at a premium if it could call them at the lower price of par. This renders the premium price list on page twenty-eight of the prospectus meaningless and misleading, since it represents prices that would never be paid. Finally, the prospectus is misleading in that it fails to disclose UE's right to directly call the bonds through the Maintenance Fund. The bond contract, however, has been judicially construed to provide UE with such a right. Yet, the Maintenance Fund provision on page twenty-nine of the prospectus indicates that funds deposited in the Maintenance Fund may be used indirectly to redeem bonds by first transferring the money to the Improvement Fund. This distinction is important because had UE redeemed the bonds indirectly through the Maintenance Fund according to the provision on page twenty-nine, it could not have avoided paying the premium prices.[6] The jury reasonably could have found that the prospectus is misleading and ambiguous in

---

6. The "Special Redemption Price" of par only applies to redemptions in an amount equal to

the required deposit—one percent of the outstanding issue. Therefore, had UE called the

that it omits material facts that would have adequately disclosed the call protection of the bonds.[7]

The testimony of several UE officials and sophisticated market analysts also supports a finding by the jury that the prospectus is misleading and omits material facts concerning the call protection. These experienced individuals believed that the prospectus prohibited UE from refunding the bonds at a lower interest rate for ten years. Mr. Welshans, UE's Vice President of Finance, testified that the thrust of the representation that UE was making in the prospectus to the members of the general public or whomever bought the bonds was that the company would not refund the bonds at a lower rate of interest for ten years. Record Tr. 3–89–90. Mr. Murray, the Corporate Secretary, and Mr. Smith, a vice president and General Counsel, both testified that UE intended to give protection against call for ten years. Mr. Fendrich, a vice president at Standard and Poor's Corporation testified that he could not understand how protection against lower cost refunding at a premium, but not at par, could be considered valid protection; he stated that this "protection" made "no

sense." Finally, Mr. Calder, a vice president at Lehman Brothers, one of the underwriters for the Series 2005 Bonds and an expert in underwriting and investment banking, testified that the redemption provision on page twenty-eight of the prospectus accurately reflected his understanding that the bonds were nonrefundable at a lower interest cost for ten years. This testimony clearly indicates that these people interpreted the prospectus as prohibiting UE from refunding the Series 2005 Bonds for ten years at a lower rate of interest, which is contrary to UE's rights as construed in the bond contract. It is also clear from the testimony of the purchasers, as well as UE officials, that both parties intended that the bonds would possess solid call protection.

Based on the language of the prospectus, the testimony of the parties expressing their intentions, and the testimony of the market experts, we conclude that the plaintiffs produced sufficient evidence for the jury to have found that the prospectus is ambiguous and misleading in that it omitted material facts that would have adequately disclosed UE's right to call the

---

bonds according to the Maintenance Fund Provision, it would have been forced to pay a premium after the first $700,000 of the call. (See the testimony of Stewart Smith, a vice president and General Counsel of UE, Record Tr. 6–24.)

7. Consequently, the prospectus, having been drafted by UE, should be interpreted and construed liberally in favor of the investors, and strictly against UE. *See Corso v. Creighton University*, 731 F.2d 529, 533 (8th Cir.1984) (contract ambiguities must be construed against the drafting party); Restatement (Second) of Contracts § 206 (1981). *See generally A.W.G. Farms, Inc. v. FDIC*, 757 F.2d 720, 726 (8th Cir.1985) ("[A] contract of insurance is to be construed liberally in favor of the insured and strictly as against the insurer."); *City of Carter Lake v. AETNA Casualty & Surety Co.*, 604 F.2d 1052, 1056 (8th Cir.1979) (doubt or ambiguity construed strictly against insurer and liberally in favor of the insured). The rationale for this rule is that the drafter of the instrument is "more likely than the other party to have reason to know of uncertainties of meaning. Indeed, [the drafter] may leave meaning deliberately obscure, intending to decide at a later date what meaning to assert." Restatement (Second) of

Contracts § 206 comment a (1981). The evidence is inconsistent concerning this point. Although UE contends that none of its officials were aware of the possibility of calling the bonds in the manner in which it planned, Mr. Friel, a vice president and the controller at UE, testified that he was aware of such a possibility in 1975. Even if UE officials did not deliberately leave the meaning of the prospectus obscure, they were obviously aware of uncertainties, the meaning of which were decided at a later date to suit UE's purposes. We are mindful that the rule of construction stated above "does not justify abandoning principles of normal interpretation where the [provision] is clear, or taking such a construction as would vary the true meaning of the [provision] and the intentions of the parties." *Johnson v. United Fire Insurance Co.*, 586 F.2d 1291, 1295 (8th Cir.1978). When read together, however, the call-protection provisions are not clear, and construing them in favor of the investors is consistent with the testimony of all the parties indicating that it was their intention that the bonds would possess solid protection against call for ten years.

bonds, in violation of Rule 10b–5(b). We also conclude that the evidence is sufficient for the jury to have found that these omissions were part of a larger scheme or course of business to defraud the bondholders. To knowingly implement a plan in 1978 to call bonds that were previously intended and marketed as having solid call protection until 1985, constitutes a course of business, or a device, scheme, or artifice that operates as a fraud on the bondholders in violation of Rule 10b–5(a) and (c). Therefore, UE's conduct falls within all three subparagraphs of Rule 10b–5.[8]

## 2. Causation

▬▬ To satisfy the causation element, the plaintiffs were required to show "some causal nexus" between UE's conduct and the plaintiffs' loss. *St. Louis Union Trust Co.*, 562 F.2d at 1048. Causation is often analyzed in terms of materiality and reliance. *Id.* When the alleged fraudulent conduct consists of misrepresentations, the plaintiff is required to show that the fact was material and that he relied upon it in making his investment decision. *Id.* When the alleged fraudulent conduct involves primarily a failure to disclose, however, the plaintiff is not required to prove reliance. Instead, reliance is inferred from materiality; that is, the causation element is established if the facts that were withheld are material. *Affiliated Ute Citizens v. United States*, 406 U.S. 128, 153–54, 92 S.Ct. 1456, 1472, 31 L.Ed.2d 741 (1972). (In a case "involving primarily a failure to disclose, positive proof of reliance is not a prerequisite to recovery. All that is necessary is that the facts withheld be material in the sense that a reasonable investor might have considered them important in the making of this decision.") Several courts also distinguish between

"transaction causation" and "loss causation," and require the plaintiff to establish both. *See Wilson v. Comtech Telecommunications Corp.*, 648 F.2d 88, 92 n. 7 (2d Cir.1981); *Huddleston v. Herman & MacLean*, 640 F.2d 534, 549 and n. 24 (5th Cir.1981), *aff'd in part, rev'd in part on other grounds*, 459 U.S. 375, 103 S.Ct. 683, 74 L.Ed.2d 548 (1983); *Schlick v. Penn-Dixie Cement Corp.*, 507 F.2d 374, 380 (2d Cir.1974), *cert. denied*, 421 U.S. 976, 96 S.Ct. 1976, 44 L.Ed.2d 467 (1975). Transaction causation is established when the plaintiff shows that the defendant's fraudulent conduct caused the plaintiff to engage in the transaction in question. *See Wilson*, 648 F.2d at 92 n. 7; *Schlick*, 507 F.2d at 380. This is nothing more than "but for" causation, which is merely another way of describing reliance. Loss causation, on the other hand, is the nexus between the defendant's fraudulent conduct and the plaintiff's pecuniary loss. *Wilson*, 648 F.2d at 92 n. 7; *Huddleston*, 640 F.2d at 549 n. 24. We hold that despite which terms are used, the evidence is sufficient to sustain a finding by the jury that the causation element was established.

▬▬ A fact is "material if it is substantially likely that a reasonable investor would consider the matter important in making an investment decision." *Austin v. Loftsgaarden*, 675 F.2d at 176 (citing *TSC Industries, Inc. v. Northway, Inc.*, 426 U.S. 438, 449, 96 S.Ct. 2126, 2132, 48 L.Ed.2d 757 (1976)). Although UE concedes that call provisions in general are material, it argues that the plaintiffs failed to establish that a differently worded redemption provision in the prospectus would have caused the average bond purchaser to make a different investment decision. We disagree. The jury heard the testimony of

---

**8.** UE argues that it cannot, as a matter of law, violate Rule 10b–5 because it was acting pursuant to a contractual right provided for in the bond contract as later construed by the Missouri Court of Appeals. In support of its position, UE cites *Broad v. Rockwell International Corp.*, 642 F.2d 929 (5th Cir.) (en banc), *cert. denied*, 454 U.S. 965, 102 S.Ct. 506, 70 L.Ed.2d 380 (1981) and *St. Louis Union Trust Co. v. Merrill*

*Lynch, Pierce, Fenner & Smith*, 562 F.2d 1040 (8th Cir.1977), *cert. denied*, 435 U.S. 925, 98 S.Ct. 1490, 55 L.Ed.2d 519 (1978). UE's argument is unpersuasive. Unlike the situations in *Broad* and *St. Louis Union Trust Co.*, the parties' intentions in this case were contrary to the subsequently construed contractual right in question. It is undisputed that UE marketed the bonds as possessing solid call protection for ten years.

various purchasers, as well as market experts who stated that had the prospectus accurately disclosed UE's right to call the bonds before March 1, 1985, UE would have been forced to offer the bonds at a lower price or at a higher yield. The jury is competent to make a materiality finding, *see id.* at 177, and we find no error in its determination in this case. Reliance is established when the plaintiff shows that he was induced to act differently than he otherwise would have in making his investment decision. *St. Louis Union Trust Co.,* 562 F.2d at 1048. Because the plaintiffs' complaint consists primarily of allegations of a failure to adequately disclose the call-protection rights, reliance in this case can be inferred from materiality. Therefore, whether this element is discussed in terms of reliance or transaction causation, it was established at trial.[9] In addition to reliance, or transaction causation, the plaintiffs were also required to prove loss causation. This issue obviously overlaps with the issue of damages, and we will address it accordingly.

### 3. Damages

 In securities fraud cases, damages are determined in accordance with the extent to which a plaintiff is actually damaged as a result of the defendant's fraudulent conduct. *Austin,* 675 F.2d at 180. Actual damages are generally measured by determining the plaintiff's out-of-pocket loss, which is in turn measured by the difference between the purchase price of the security and its actual value. *Id.* (citing *Harris v. American Investment Co.,* 523 F.2d 220, 225 (8th Cir.1975), *cert. denied,* 423 U.S. 1054, 96 S.Ct. 784, 46 L.Ed.2d 643 (1976)). In *Harris v. American Investment Co.,* the court recognized that the actual value of the security may be determined either on the date of purchase or on the date the fraud was discovered. 523 F.2d at 225–27. The court acknowledged that in some cases, especially when the security is traded publicly, it may be difficult to ascertain the value of the security transferred in connection with the fraudulent conduct and in such cases the value may be determined on the date the fraud is discovered. *Id.* at 226. In any event, "the function of the court 'is to fashion the remedy best suited to the harm.'" *Austin,* 675 F.2d at 181 (quoting *Garnatz v. Stifel, Nicolaus & Co.,* 559 F.2d 1357, 1360 (8th Cir.1977), *cert. denied,* 435 U.S. 951, 98 S.Ct. 1578, 55 L.Ed.2d 801 (1978)). UE argues that the proper measure of damages is the difference between the purchase price of the bonds and the value of the bonds once the alleged fraud was discovered, which was on the day the plan to call the bonds was announced. UE contends that the evidence is insufficient to establish damages. Although the price of the bonds dropped twelve points from approximately 113 to 101, or $120 per bond, on the day the plan was announced, UE argues that because the named plaintiffs purchased the bonds for less than 101, they did not incur a loss as a result of UE's conduct. We disagree.

 The proper measure of damages in this case is the difference between the purchase price and the actual value of the bonds on the date they were issued. This remedy is best suited to the harm in this case because it represents the reduc-

---

9. UE also contends that the evidence is insufficient to establish reliance by those bondholders who held bonds on April 11, 1978, but who did not purchase them in 1975. UE argues that these bondholders did not rely on the alleged omissions of material fact by UE in 1975. We disagree. False or misleading information, such as that involved in this case, can actually harm investors directly—through actual reliance, or indirectly—by affecting the market upon which the investor relied and traded. *Shapiro v. Midwest Rubber Reclaiming Co.,* 626 F.2d 63, 69 (8th Cir.1980) (court held that the plaintiffs were not damaged as a result of the defendants' conduct because they neither relied nor traded), *cert. denied,* 449 U.S. 1079, 101 S.Ct. 860, 66 L.Ed.2d 802 (1981). The plaintiffs established that UE's misleading prospectus inflated the price of the bonds on the open market, which these later purchasers relied upon in making their investment decision. *See Lipton v. Documation, Inc.,* 734 F.2d 740, 748 (11th Cir. 1984) (adopting a fraud on the market theory of recovery), *cert. denied,* — U.S. ——, 105 S.Ct. 814, 83 L.Ed.2d 807 (1985).

tion in the value of the bonds caused by the lack of call protection. Although the plaintiffs purchased the bonds for less than 101, the bonds were worth much less because the call protection that the plaintiffs thought they were purchasing did not exist. The plaintiffs paid more for the bonds than they were actually worth. This is not one of those cases recognized by the court in *Harris v. American Investment Co.* in which the value of the security should be determined on the date the fraud was discovered because its true value on the date it was purchased is too difficult to ascertain. To the contrary, we believe that the true value of the bonds on the date they were issued is reflected by the *drop* in the market price once the fraud was discovered. We agree with the plaintiffs that the reduction in market value fairly represents the reduction in the initial purchase price of the bonds that would have been necessary in order to sell them at 10½% without the call protection. The plaintiffs introduced ample evidence demonstrating that if UE had issued the bonds without the ten-year-call protection, the plaintiffs would have either paid a substantially lower price for the bonds or demanded a higher coupon rate. The evidence indicated that "at least two major underwriters," Merrill Lynch and Halsey Stuart, advised UE that it would cost the company several basis points if the bonds were issued without the call protection. This evidence was supported by the testimony of UE officials and market analysts that the bonds could not have been sold for par and at 10½% without the ten-year-call protection. (See, for example, the testimony of Mr. Welshans, Record Tr. 3–63–73.) We conclude, therefore, that the jury could reasonably find on the basis of these facts that UE's conduct in announcing its plan to call the bonds, which rendered the representations in the prospectus misleading, caused the plaintiffs' damages. Further, we hold that the damages are best measured by the difference between the purchase price of the bonds and their true value on the date purchased.[10]

### 4. In connection with

Section 10(b) and Rule 10b–5 proscribe fraudulent conduct "in connection with the purchase or sale of any security." 15 U.S.C. § 78j (1982); 17 C.F.R. § 240.-10b–5 (1985). Plaintiffs must show that the fraudulent conduct "touches" the purchase or sale of the securities. *See Superintendent of Insurance v. Bankers Life & Casualty Co.,* 404 U.S. 6, 12–13, 92 S.Ct. 165, 169, 30 L.Ed.2d 128 (1971). It is undisputed in this case that the named plaintiffs purchased their bonds in connection with UE's fraudulent conduct. UE argues, however, that the other members of the class who held bonds on April 11, 1978 did not purchase their bonds in connection with the alleged omissions of material fact in the prospectus. Although the *Bankers Life* Court did not explain what constitutes "touching" a security transaction, we believe that UE's fraudulent conduct "touches" the class members' purchases of their bonds. The market price of the bonds reflected the misleading call protection. If the call protection had been accurately disclosed before these members of the class purchased their bonds, they would have paid less for the bonds or demanded a higher yield. Clearly, these members of the class purchased their bonds in connection with UE's fraudulent conduct.[11]

---

**10.** UE also urges that because the plan was cancelled, the plaintiffs were not damaged, and therefore they lacked standing to sue. We disagree. As a result of UE's fraudulent scheme or course of business, the plaintiffs paid for call protection that they in fact did not receive. Consequently, the plaintiffs were injured, and have standing to sue.

**11.** UE also argues that, with the exception of the named plaintiffs, the evidence did not establish that each member of the class was a purchaser of the bonds. The Supreme Court has ruled that only purchasers or sellers of securities may maintain a private cause of action for money damages pursuant to Rule 10b–5. *Blue Chip Stamps v. Manor Drug Stores,* 421 U.S. 723, 95 S.Ct. 1917, 44 L.Ed.2d 539 (1975). The Court stated that the virtue of its ruling "is that it limits the class of plaintiffs to those who have at least dealt in the security to which the prospectus, representation, or omission relates." *Id.* at 747, 95 S.Ct. at 1931. *See Vervaecke v. Chiles,*

Finally, the plaintiffs were required to prove scienter, that is, that UE engaged in the fraudulent conduct with an intent to deceive, manipulate, or defraud the bondholders. *See Hochfelder*, 425 U.S. at 193, 96 S.Ct. at 1381. UE argues that the plaintiffs failed to establish scienter at the time the prospectus was issued in 1975. Several UE officials testified that in 1975 they were unaware of the possibility of refunding the bonds in any fashion before March 1, 1985. UE argues that because the alleged omissions of material fact in the prospectus were not made with scienter, the plaintiffs cannot recover. We disagree. We have stated that the evidence is sufficient for the jury to have found that UE's activities between March of 1975 and June of 1978 constituted a scheme or course of business that operated as a fraud upon the bondholders. Although UE officials had no intent to defraud when they represented that the bonds possessed ten-year-call protection, they certainly intended to defraud the bondholders of this protection when they announced the plan to call the bonds before the ten-year period had run. There is substantial evidence demonstrating that UE knew that the plan was contrary to its representation in the prospectus concerning the call protection. Several UE officials testified that the company, without a doubt, initially intended to provide "solid protection" against call for ten years. The evidence indicated that Mr. Grainger, one of UE's Advisory Directors, vehemently opposed the plan as "subordinating moral responsibility for financial gain," and cautioned UE's president that the "contract with the Bondholders should be kept inviolate." UE's Vice President of Finance, Mr. Welshans, testified that the company was well aware that the plan was contrary to the protection that the underwriters, the bondholders, and Union Electric all mutually intended the bonds to possess. The evidence also indicated that UE only hesitated long enough to assure itself that it could re-enter the bond market at a later date without any trouble. Once UE observed that FP & L's plan did not adversely affect its ability to re-enter the market, UE implemented its plan. UE's conduct in this case certainly is inconsistent with the fundamental purpose of the Securities Exchange Act, which is " 'to substitute a philosophy of full disclosure for the philosophy of *caveat emptor* and thus to achieve a high standard of business ethics in the securities industry.' " *Affiliated Ute Citizens*, 406 U.S. at 151, 92 S.Ct. at 1471 (quoting *SEC v. Capital Gains Research Bureau*, 375 U.S. 180, 186, 84 S.Ct. 275, 280, 11 L.Ed.2d 237 (1963)). We believe that the plan to call the bonds in these circumstances is within the range of ingenious devices used to manipulate securities that Congress intended to prohibit. Clearly, the evidence is sufficient from which the jury could have found that UE acted with the intent to defraud the bondholders.[12]

*Heider & Co.*, 578 F.2d 713, 719 (8th Cir.1978). We believe that the members of the class who held the bonds on April 11, 1978 dealt in the security to which the omissions concerning the call protection relate.

**12.** The district court instructed the jury that reckless behavior would constitute scienter. Instruction No. 18A. Although the Supreme Court has explicitly left open the question whether reckless behavior satisfies the scienter requirement, *Hochfelder*, 425 U.S. at 193–94 n. 12, 96 S.Ct. at 1381 n. 12, this instruction reflects the prevailing view of the courts of appeals. *See, e.g., Woods v. Barnett Bank*, 765 F.2d 1004, 1010 (11th Cir.1985); *Teamsters Local 282 Pension Trust Fund v. Angelos*, 762 F.2d 522, 528 (7th Cir.1985); *Burgess v. Premier Corp.*, 727 F.2d 826, 832 (9th Cir.1984); *Broad v. Rockwell International Corp.*, 642 F.2d 929, 961 (5th Cir.) (en banc), *cert. denied*, 454 U.S. 965, 102 S.Ct. 506, 70 L.Ed.2d 380 (1981). In *Stokes v. Lokken*, 644 F.2d 779 (8th Cir.1981), the court addressed this issue in the context of aiding and abetting violations of section 10(b) and Rule 10b–5. The court, without defining a comprehensive standard, held that the defendant's "conduct [fell] short of any reasonable formulation of the requisite legal standard" for recklessness. *Id.* at 783. Although we do not address the issue of recklessness since we hold that sufficient evidence exists from which the jury could have found that UE intentionally defrauded the bondholders of the call protection, we believe that the converse of *Stokes* is true in this case. Here, UE's conduct surpasses any reasonable formulation of the requisite legal standard for recklessness. It was UE's intent that the bonds would possess solid protection against call for ten years. To represent and market the bonds

UE relies heavily on *Lucas v. Florida Power & Light Co.*, 765 F.2d 1039 (11th Cir.1985) in support of its position that it did not violate section 10(b) and Rule 10b–5. In *Lucas*, the plaintiffs, FP & L bondholders, instituted a class action suit against FP & L, alleging securities fraud as a result of FP & L's *redemption* "of approximately half of the outstanding 10⅛ bonds at the special redemption price," within five years after the bonds were purchased. *Id.* at 1041. The plaintiffs claimed that the prospectus indicated that the bonds were nonredeemable for five years. The Eleventh Circuit affirmed the district court's determination that the prospectus did not misrepresent or omit material facts concerning the redeemability of the bonds. *Id.* at 1045. *Lucas*, unlike the instant case, involved a redemption—not a refund—of the bonds. *Id.* at 1041 n. 7. Further, FP & L's prospectus clearly indicated that the five-year-call protection applied to *lower cost refunding*, but *not* to *redemptions*. *Id.* at 1041. Moreover, UE officials, unlike FP & L officials, *intended* and *represented* that the bonds would possess solid protection against call of any kind for the limited time period. UE's reliance on *Lucas* is misplaced.

During oral argument, UE urged the court to consider the holding in *Feldbaum v. Avon Products, Inc.*, 741 F.2d 234 (8th Cir.1984). There, the plaintiff claimed that a "lock-up option," granted in connection with a tender offer, was a manipulative practice or device in violation of section 10(b), Rule 10b–5, and the Williams Act, which added several sections to the Securities Exchange Act, including section 14(e). *Id.* at 237. The court recognized that the plaintiff did "not allege that material information about the option was withheld or distorted." *Id.* The court affirmed the district court's dismissal of the complaint for failure to state a claim for relief because the option was not a manipulative practice or device. The court held that, in light of the full-disclosure purpose of the Williams Act, some element of deception or

misrepresentation is essential to a valid section 14(e) claim. *Id.* The court noted that its discussion of 14(e) applied to an allegation of a violation of 10(b) and 10b–5. *Id.* at n. 8. UE apparently finds support in the *Feldbaum* court's discussion and holding for its proposition that the transaction-fraud theory of recovery asserted by the plaintiffs is no longer viable. UE argues that therefore the plaintiffs cannot, as a matter of law, recover on that theory.

UE's argument is unpersuasive for two reasons. First, UE's reasoning is accurate only to the extent that any theory of recovery pursuant to section 10(b) and Rule 10b–5, whatever terminology is used to describe it, is not viable *unless* the plaintiff alleges and proves "intentional or willful conduct designed to deceive or defraud investors." *Hochfelder*, 425 U.S. at 199, 96 S.Ct. at 1384 (describing the term "manipulative" in the context of 10(b) liability). This is the type of conduct that the *Feldbaum* court was referring to when it held that an allegation of deception or misrepresentation is an essential requirement. The plaintiffs in this case clearly made such an allegation in their "First Amended Complaint" at paragraph twenty-one, and in their "Amendment to First Amended Complaint" at paragraph thirty-one. Further, the plaintiffs' proof at trial was consistent with these allegations. Second, and more importantly, we decline to distinguish between disclosure fraud and transaction fraud in this case when describing UE's conduct. As we stated above, we view UE's entire conduct from March, 1975 to April, 1978 as a course of business and a scheme or artifice to defraud the investors, which includes the misleading call-protection provisions in the prospectus.

In sum, we hold that the verdicts are supported by substantial evidence in the record. The plaintiffs introduced sufficient evidence from which the jury could have found that the parties mutually intended that the bonds would possess solid protec-

---

as possessing such protection, and then implement a plan to call the bonds within the ten-

year period, constitutes at the very least recklessness on UE's part.

tion against call for ten years, that this protection was material and affected the price of the bonds, and that it was relied upon by the plaintiffs. The evidence also supported a finding by the jury that UE intended to defraud the investors of this protection when it announced its plan to call the bonds in 1978, causing the market value of the bonds to drop. Finally, the evidence showed that as a result of UE's fraudulent conduct between March, 1975 and April, 1978, the value of the bonds purchased by the plaintiffs was less than the price they paid, which was reflected by the market drop once the investors discovered the fraud. Consequently, UE's conduct violated all three subparagraphs of Rule 10b–5. Therefore, we will not disturb the jury's verdicts on the plaintiffs' section 10(b) and Rule 10b–5 claims.

### C. Instructions

UE contends that the court erroneously instructed the jury with respect to both liability and damages. The instructions reflect the bifurcated nature of the trial. In the liability portion of the trial, the jury was instructed not to be concerned with ascertaining a specific dollar amount of damages. Instead, the court instructed the jury "to determine in a general sense, whether or not the plaintiffs have sustained some damage."

UE argues that the instructions failed to require a finding by the jury that the plaintiffs suffered a causally related loss. UE's argument is without merit. When a portion of the jury instructions are challanged, we must look to the instructions as a whole. *Simpson v. Norwesco, Inc.,* 583 F.2d 1007, 1013 (8th Cir.1978). The instructions clearly informed the jury that to find liability, it must determine that the plaintiffs suffered a loss. The specific dollar amount was determined in the damage portion of the trial. The court did not erroneously instruct the jury.

With respect to damages, UE argues that the court erroneously instructed the jury on the proper measure of damages. We thoroughly addressed this issue

in our discussion above, and concluded that the damage measurement was proper. UE also argues that the jury should have been instructed to reduce the amount of damages by the value of any benefits received by the bondholders as a result of their investment. This argument is also without merit. In support of its position, UE relies on *Austin,* 675 F.2d at 181. In *Austin,* the court held that when rescissional or restitutional damages are awarded instead of the traditional out-of-pocket damages, the award should be reduced by any value received as a result of the fraudulent transaction. *Id.* The *Austin* court specifically limited its holding, however, "to cases involving investments that are expressly marketed and sold as tax shelters." *Id.* at 183; *see Austin v. Loftsgaarden,* 768 F.2d 949, 953 n. 5 (8th Cir.) (en banc), *cert. granted, sub nom., Randall v. Loftsgaarden,* —— U.S. ——, 106 S.Ct. 379, 88 L.Ed.2d 333 (1985). In this case, the plaintiffs were not awarded rescissional or restitutional damages, and the bonds were not marketed and sold as tax shelters. Consequently, we hold that the court properly refused to instruct the jury to reduce the award by the value of any benefits received by the plaintiffs.

### D. Exclusion of Evidence

Finally, UE contends that the court erred in excluding all evidence concerning the market value of the bonds after the plan was cancelled. Specifically, UE argues that the court should have allowed its witness to testify that the market value of the bonds merely dropped as a result of UE's announcement of the plan, and that when the plan was cancelled, the bonds recovered. UE argues that because the bonds recovered, the plaintiffs did not suffer a loss. UE also argues that the court erroneously excluded evidence of the plaintiffs' continued receipt of interest payments.

The district court has broad discretion concerning the admissibility of evidence, and we will disturb the court's ruling only upon a clear showing of an abuse

of that discretion. *Smith v. Firestone Tire & Rubber Co.*, 755 F.2d 129, 134 (8th Cir. 1985). By continuing to hold the securities after the discovery of the fraud, the investor "has, in effect, made a second investment decision unrelated to his initial decision to purchase the [securities]." *Harris v. American Investment Co.*, 523 F.2d at 228. The *Harris* court noted that whatever happens after this second investment decision has no bearing on the measure of the investor's damages. *Id.* Although the court was responding to the argument that the investor should have mitigated his damages by selling his stock after discovering the fraud, we believe that the same principle applies in this case. *See Nye v. Blyth Eastman Dillon & Co.*, 588 F.2d 1189, 1198 (8th Cir.1978). The bondholders made a second investment decision when they decided to hold the bonds after the plan was announced and the market value of the bonds had plunged. The recovery of the bonds two months later, and the continued receipt of interest payments have no bearing on the measure of the plaintiffs' damages caused by UE's fraudulent conduct. Therefore, we hold that the district court did not abuse its discretion in excluding the proffered evidence.

## III. CONCLUSION

In conclusion, we hold that the plaintiffs' cause of action was not barred by the statute of limitations, the evidence is sufficient to sustain the jury's verdicts on the section 10(b) and Rule 10b–5 claims, and the court did not err in instructing the jury or in excluding UE's proffered evidence. Therefore, we affirm the judgment of the district court.