THE NATIONAL REFINING COMPANY, APPELLANT, v. ROY COX, RESPONDENT.—57 S. W. (2d) 778.

Kansas City Court of Appeals.   March 6, 1933.

*Ringolsky, Boatright & Jacobs* for appellant.

*John F. Cell* for respondent.

BLAND, J.—This is an action for an injunction and an accounting. A temporary injunction was issued by the court but, thereafter, the court sustained defendant's motion to dissolve, resulting in this appeal.

The facts show that plaintiff is a corporation with its chief offices and place of business in Cleveland, 'Ohio, and with a branch office and place of business in Kansas City; that it is engaged in the manufacture and sale of gasoline, oils and other petroleum products, operating a number of filling stations throughout the country; that defendant and his wife were the owners and operators of a filling station located on United States Highway No. 50, directly west of Lees Summit; that the defendant erected the improvements valued at $3,000; that these consist of a building in which is located a kitchen and lunch room on the first floor and above are the living quarters for defendant and his family; that the filling station consisting of

two pumps and tanks with no canopy overhead, is detached from the building.

From October, 1929, to May 12, 1931, defendant obtained his supplies for the filling station from the Kansas City Motor Fuel Supply Company. On May 12, 1931, plaintiff brought to defendant two contracts prepared by it, consisting of a lease of the filling station to be made by defendant and his wife to plaintiff and an agency contract. The latter provided for the employment of defendant by plaintiff as its agent to operate the station. The lease was on the last-mentioned day executed by defendant and his wife. It provides that it shall run from April 30, 1931, to April 29, 1932, with the privilege to the lessee of extending the lease for one year. The rent reserved in the lease is a cent per gallon upon certain gasoline to be sold at the station. It provides that the lessors shall keep the premises in good repair and pay all taxes upon the premises, and in the event that they fail to do so, they may be paid by the lessee and charged to the lessors and the amount thereof withheld by it from the rent. The lessee is given the right to alter the premises and the equipment thereon.

The lease further provides that the premises shall "be used as a gasoline filling and automobile service station;" that if the necessary legal permission to conduct and operate the station cannot be obtained or, if subsequently revoked, after having been obtained, the lessee, at its option, may terminate the lease; that in case the premises are rendered unfit for occupancy by fire, storm or other cause, no rent shall be paid until the premises are restored by the lessors, and if lessors fail to do this within thirty days, lessee may restore the premises, charge the cost of the same to the lessors and withhold sufficient from the rent to reimburse itself; that the lessee shall perform all of the covenants and agreements of the lease on its part to be performed and have the peaceful and quiet enjoyment and possession of the premises; that, under certain conditions not necessary to mention herein, the lessee is given an option to purchase the premises. The lessee is given the right to cancel the lease by giving thirty days' notice to the lessors. The lease further provides that it contained the entire contract between the parties and that "The determination of any other contract between the parties shall have no effect upon the existence of this lease."

The contract wherein defendant was employed to operate the station by the plaintiff, provides that plaintiff employs defendant "to superintend and operate *its service station* . . . for the sale of gasoline, greases and other products" of plaintiff; that defendant shall give his exclusive time to the employment and to the operation of the station in compliance with the rules, regulations and directions

of the plaintiff; that defendant is to pay all of the operating expenses of the station and for the advertising; that he shall not handle any other petroleum products except those of the plaintiff, with which the latter is to keep the station fully supplied; that the title to the supplies furnished by it is to remain in it; that defendant shall account for and remit the collections from the station, less his commission, at the time the supply of each product is replenished by plaintiff, or from time to time as plaintiff may demand; that defendant is to be paid for his services by a commission of so many cents, therein mentioned, per gallon on the various types of gasoline sold and, on all other products, except gasoline, his commission shall be in amounts equal to the difference between plaintiff's established retail price for such goods and its dealers' list price; that defendant is to replace all of the equipment loaned or supplied him by the plaintiff, which may be lost, stolen, destroyed or damaged, through no fault of the plaintiff. The contract further recites that plaintiff holds the filling station under a lease and that unless sooner terminated the contract shall terminate with the termination of the lease, and that the agent may terminate it on giving sixty days' notice in writing to the plaintiff.

The lease and the agency contract were duly executed by the parties and the defendant operated the station for the plaintiff under the terms of the contract. However, sometime before the month of February, 1932, defendant became in arrears and had not paid to plaintiff the money which was due it. Defendant had also given plaintiff some bad checks. There was considerable negotiation between the parties with reference to the indebtedness, when, on February 2, 1932, defendant notified plaintiff, by letter, that on April 29, 1932, he would not consider himself under any obligations to plaintiff; that he would not purchase any products of any kind after that date.

On February 11, 1932, defendant wrote plaintiff's agent at Kansas City, notifying him that he was "breaking the contract that now exists between us," and asking him to call and "check up everything," and that he would thereafter make arrangements to pay for what he owed; that he would return plaintiff's globes and signs as soon as "your gasoline has exhausted. You may pick them up at your pleasure."

On February 12, 1932, plaintiff's Kansas City agent wrote defendant that plaintiff would not release him from his contract and called his attention to the fact that he had failed to keep his part of the agreement; that he had failed to pay for the goods that were sent to him on consignment and demanded payment in full for the goods "which cannot be accounted for;" that should it fail to re-

ceive prompt payment that it would "pick up and return to our warehouse all of our products now in your possession," and would place the matter in the hands of its attorney to enforce collection of the balance due and to enjoin defendant from distributing petroleum products of any other company from the property.

Defendant came to the office of plaintiff's agent in Kansas City, and there discussed the matter with the latter. Defendant offered to pay what was owing if plaintiff would cancel the lease and contract. He stated that if he could get these cancelled some one, whom he did not mention, would furnish him with the money to pay what was owing to plaintiff. The matter ran on until February 26, when plaintiff sent a man and a truck to the station to remove its personal property, consisting of filling station products and two glass globes. At this time defendant was indebted to plaintiff in the sum of $70.85. These globes were on the pumps and contained plaintiff's advertising. There were several of plaintiff's signs there advertising its products but they were not taken away because the driver of the truck had not been directed by plaintiff to take them.

On the day that plaintiff's supplies were removed, defendant began to sell the products of the Kansas City Motor Fuel Supply Company and he put up its advertising signs. He testified that he did not start to sell any of that company's products until he took down all of plaintiff's signs. Plaintiff's evidence tends to show that there was a "Boy and Slate" sign up after defendant started to sell the product of the new company.

During the time that defendant sold plaintiff's products he cleared on an average of $250 per month. One-half of this was from the sale of plaintiff's products and the other half from the operation of the restaurant.

On March 2, 1932, plaintiff's attorney wrote defendant calling his attention to the fact that he was indebted to plaintiff and stating that plaintiff was informed that defendant had been obtaining other gasoline and had other petroleum products, for sale and distribution at the filling station, in violation of his contract with plaintiff; that the writer was "informed that the merchandise which you have failed to account for has been sold or disposed of by you and the money collected and you have failed to turn over the money collected . . . to The National Refining Company;" . . . that plaintiff "has instructed us to take positive steps against you to secure an accounting for its property which it delivered to you under the agency contract. Also it has instructed us to take immediate steps to prevent you from distributing any other gasoline or petroleum products other than contemplated by the contract. Before resorting to legal action we are giving you this opportunity to get in immediate touch with

us and with The National Refining Company and avoid the necessity of litigation.''

After this, defendant talked to both plaintiff's attorney and its agent in Kansas City, attempting to get plaintiff to release him from the agency contract and the lease and stating that, if he could get released, he would pay what he owed to plaintiff; that there was somebody who would advance him the money for this purpose. But plaintiff refused to comply with his request. On March 4, defendant wrote plaintiff's agent in Kansas City: ''I have a friend that told me if you would release me he would let me have the money to pay you otherwise he would not;'' that if plaintiff had not taken away the gasoline and oils from the station he would have soon ''caught up with my consignment.'' On March 5, defendant wrote plaintiff again saying that he had some unnamed friend who would furnish the money to plaintiff if defendant could get released and if plaintiff would not release him to bring back and reinstall its products in the filling station but ''please don't exercise your option'' under the lease. Not being able to get the lease and agency contract cancelled defendant continued to do business with the Kansas City Motor Fuel Supply Company until this suit was filed, which occurred on March 18, 1932.

In its petition plaintiff prays that defendant be enjoined from handling, dealing in, advertising or dispensing from the premises in question any petroleum products other than those manufactured by plaintiff, and that he be required to account for the goods he had received and sold that had not been paid for, and for such other relief as it might be entitled to in equity. Upon the issuance of the temporary injunction defendant deposited a bond in the sum of $1,000, as required by the court.

The answer, as well as the motion to dissolve the temporary injunction, attacks the validity of the lease on the ground that it is void for lack of mutuality. Defendant makes the same contention here, as well as contending that the agency contract was terminated by mutual consent of the parties on February 26, 1932, when plaintiff removed its property from the premises. We may assume, for the purposes of this case, that the employment of defendant as agent by plaintiff was terminated, as contended by defendant. But we do not think that this deprives plaintiff of the right to an injunction because we are of the opinion that the lease, itself, is sufficient grounds upon which to predicate such a proceeding.

As to the lease, defendant contends that it is unilateral; that, while it contains much language indicating obligations upon defendant, plaintiff did not obligate itself to do anything; that it was left to the ''wish or will of plaintiff whether the premises shall be made a going concern or whether it will deliver any gasoline to the premises.''

We think there is no merit in this contention. While the lease does not, in express terms, provide that plaintiff should conduct a filling station on the premises, or should deliver such a quantity of gasoline, oil and other petroleum products to the station as would be necessary to meet the trade thereat, such obligation on the part of the plaintiff must be implied from the terms of the lease. The lease provides that the station shall be used as a gasoline filling and automobile service station. It also provides that, in the event the necessary legal permission to operate the business at the station could not be obtained, or if obtained it should be subsequently revoked, or for any other reason it should become illegal for lessee to conduct said business upon said premises, etc., plaintiff might terminate the lease. Section 8 provides in the event of fire, if the lessor did not repair the lessee should do it. This clause indicates an intention of continuity of the business.

Defendant had been conducting a filling station upon the premises for sometime prior to the execution of the lease. In the lease he sought to grant away the use and occupancy of the premises for the period of the lease and he could not, during that time, use the premises as a filling station on his own account. There was no way for defendant to earn the rent reserved of a cent per gallon on certain gasoline sold unless plaintiff kept the station supplied with that product. We think that it necessarily follows from all of this that plaintiff was required to deliver the necessary petroleum products to the station to take care of the business.

"It very frequently happens that contracts on their face and by their express terms appear to be obligatory on one party only; but in such cases, if it be manifest that it was the intention of the parties, and the consideration upon which one party assumed an express obligation, that there should be a corresponding and correlative obligation on the other party, such corresponding and correlative obligation will be implied." [Lewis v. Atlas Mut. Life Ins. Co., 61 Mo. 534, 538.] [See also Wood v. Lady Duff-Gordon, 222 N. Y. 88; Meers v. Munsch-Protzmann, 217 N. Y. S. 256; Ray v. Natural Gas Co., 138 Pa. St. 576, 589; Brainerd v. Arnold, 27 Conn. 617; Shenandoah Land Co. v. Hise, 92 Va. 238; Walker v. Tucker, 70 Ill. 527.] If the lease is subject to the implications that we have drawn, there is no question but that it was not unilateral, but a lease valid and binding on both parties. [Royal Brewing Co. v. Uncle Sam Oil Co., 226 S. W. 656.]

But defendant says that all of these provisions in the lease that we have alluded to create obligations upon the plaintiff only in the event that it decided to operate the filling station and that the provision in the lease that the "premises shall be used as a gasoline

filling and automobile service station" was merely for the purpose of confining the nature of the business in the event plaintiff elected to operate the station.

A somewhat similar contention was well answered in the case of Wood v. Lady Duff-Gordon, supra, 1. c. 92, as follows:

"It is true, of course, as the Appellate Division has said, that if he was under no duty to try to market designs or to place certificates of indorsement, his promise to account for profits or take out copyrights would be valueless. But in determining the intention of the parties, the promise *has* a value. It helps to enforce the conclusion that the plaintiff *had* some duties. His promise to pay the defendant one-half of the profits and revenues resulting from the exclusive agency and to render accounts monthly, was a promise to use reasonable efforts to bring profits and revenues into existence. For this conclusion, the authorities are ample."

The fact that plaintiff reserved the right to cancel the lease upon giving thirty days' notice, while a like right is not given to the defendant, does not deprive it of its bilateral character. It is not necessary for mutuality that every covenant be mutual. [35 C. J., p. 1145; 13 C. J., p. 333.] The rule is against construing a contract as unilateral and in favor of the construction that will make it valid, if such a construction can reasonably be made. [13 C. J., p. 333, B. 34.]

Defendant insists that owing to the fact that plaintiff drew the lease it should be construed in its most unfavorable light to it. But this rule of construction comes into play only where there is ambiguity in the writing and the fact that it is necessary to imply matters in a contract or lease in order to uphold its validity does not give rise to an ambiguity. [Walker v. Tucker, supra.] We shall, therefore, not apply this and other rules of construction attempted to be invoked by defendant which are for the purpose of solving an ambiguity in a contract.

If we were applying any rule of construction to the lease it would be that rule providing for such a construction as the parties themselves have placed upon the lease (35 C. J., p. 1180), for the things that the parties do under the terms of a contract are, in themselves, often contractual in their nature.

Immediately upon the execution of the lease the parties entered into an agreement whereby defendant was employed as plaintiff's agent to dispense the latter's products at the station. This contract starts out by reciting that plaintiff "hereby employs, the agent (defendant), to superintend and operate *its service station*," etc. The language in nearly every paragraph of the agency contract indicates, beyond a question, that it was plaintiff's filling station where the

work was to be performed. One paragraph in the agency contract recites that "plaintiff holds the above described service station under a lease" and that the agreement should terminate when the lease terminated. Defendant actually became the agent of the plaintiff and disbursed plaintiff's products from the station some nine months prior to the time plaintiff removed its products. The record before us does not disclose that there ever was any claim, nor is there any made now, by the defendant that plaintiff did not furnish large enough quantities of its products to him to properly operate the station and meet the demands of the customers. Defendant has at all times recognized the validity of the lease and only a few days before this suit was filed wrote plaintiff a letter asking that he be released from its lease, stating: "I now realize that you have me in a nine hole." We have no doubt as to the validity of the lease.

However, defendant contends that this is not a proper case for an injunction; that plaintiff withdrew its supplies when they were the lifeblood of the filling station; that in addition to the business of the filling station defendant's living quarters were there and he conducted a restaurant business from which a little more than half of his total income was derived; that to enjoin him would be of little benefit to plaintiff, because, all that it seeks in this proceeding is a desire for vindication of its contract, the collection of a small amount and the protection of an alleged good will that it had in the situation; that on the other hand, an injunction would cause great injury to the defendant.

Defendant cannot complain because plaintiff withdrew its supplies, for these were withdrawn at his invitation. It is not true that the benefit of an injunction to plaintiff would be small. The evidence shows that the net profits derived from running of the filling station was about $250 per month, one-half of which was from the dispensing of plaintiff's products. There was no notice to defendant on the part of plaintiff to terminate the lease and consequently, under its terms, it does not expire until April 29, 1933, which is a long time after this suit was filed. We are unable to see how defendant can be injured at all in a legal sense. There was nothing for him to lose after he threw up his agency contract and invited plaintiff to remove its products and advertising from the station, which invitation it accepted. After this defendant had no interest in the station, except the rent reserved in the lease and there is no suggestion in the evidence that plaintiff will not continue to operate this station and its products will not continue to be sold thereat. The lease recites: "that the termination of any other contract between the parties hereto shall have no effect upon the existence of this lease."

Defendant finally wrote a letter to plaintiff offering to restore plaintiff's products at the station and to proceed with the contract,

complaining that he could not operate the station without petroleum products and stating that plaintiff would not release him from his agreements. The tone of his letter of March 5, indicates that he was more interested in being released, because he stated: "Bring me the gasoline and oil Monday, March 7, and we will go ahead as before *but I am begging you to release me on April 29, 1932. Please don't exercise your option.*" (Italics ours.) The request for a return of plaintiff's supplies was after the matter was turned over to plaintiff's attorney and suit was threatened and defendant realized that he could not get out of the lease. As he stated in his letter of March 5, "I now realize that you have me in the nine hole."

Defendant never disclosed the name of the person, who he claimed was to advance the money for which he was indebted to plaintiff, prior to the filing of this suit. We are by no means convinced that it was not to be advanced by the Kansas City Motor Fuel Supply Company, one of plaintiff's competitors, who desired to reinstall its products in the station. However, notwithstanding the fact that plaintiff refused to release defendant he wholly ignored his obligations and installed at the filling station the products of a competitor of plaintiff and by his conduct we have no doubt but that he became a trespasser upon plaintiff's property and an injunction will lie on the theory of trespass. The leasehold title that plaintiff held was a sufficient interest upon which to base the action. [32 C. J., p. 121.] While, defendant in his answer and motion to dissolve, denied title in plaintiff, this was not sufficient for the purpose of putting a title in issue to such an extent as to require its establishment by a suit at law, as the material facts on which plaintiff's title is based are admitted and defendant recognized plaintiff's title up to the time suit was brought. [32 C. J., p. 123; 1 High on Injunctions, pp. 663, 666; 2 Beach on Injunctions, p. 1145.] Defendant at no time denied plaintiff's right of possession, but up to the time this suit was brought he recognized not only plaintiff's title but all of its rights in the property. We think that plaintiff had sufficient title and possession upon which to maintain this action. [32 C. J., pp. 130, 131.]

"An examination of the later authorities upon the subject of injunctions against trespass discloses a decided tendency to adopt the adequacy or inadequacy of the legal remedy as the sole and ultimate test as to the right to equitable relief in such cases." [1 High on Injunctions, p. 686.]

The record discloses that defendant is insolvent. For this reason plaintiff has no adequate remedy at law, as a suit for damages would avail it nothing. We think that plaintiff is entitled to an injunction. [See section 1519, R. S. 1929, 32 C. J., pp. 136, 137; Turner v. Stewart, 78 Mo. 480; Carpenter v. St. Joseph, 263 Mo. 705, 713, 714;

Sheetz v. Price, 154 Mo. App. 574; McAlister v. Graham, 200 Mo. App. 279; Tie Co. v. Stone, 135 Mo. App. 438; No Kol Co. v. Becker, 318 Mo. 292.]

The judgment is reversed and the cause remanded. [State ex re¹. v. Smith, 188 Mo. 167.] All concur.