**CITY OF ST. JOSEPH, Missouri, Appellant,**

v.

**LAKE CONTRARY SEWER DISTRICT, Respondent,**

**Village of Country Club, Missouri, Respondent.**

**No. WD 68162.**

Missouri Court of Appeals, Western District.

April 29, 2008.

Paul A. Campo, Lee's Summit, MO, for appellant.

George Scott Murray, St. Joseph, MO, for respondent Lake Contrary Sewer District.

Ronald Ray Holliday, St. Joseph, MO, for respondent Village of Country Club, Missouri.

Before VICTOR C. HOWARD, Chief Judge, LISA HARDWICK, Judge and JAMES WELSH, Judge.

VICTOR C. HOWARD, Chief Judge.

The current appeal involves the interpretation of a sewer subscription contract in which the City of St. Joseph ("St. Joseph") agreed to treat sewage delivered to it from two smaller neighboring suburbs, the Village of Country Club ("Country Club") and the Lake Contrary Sewer District ("Lake Contrary") (together "subscribers"). St. Joseph sought, and was denied, a declaratory judgment and mandatory injunction ordering the subscribers to comply with a duly passed ordinance which required the subscribers to perform comprehensive testing and inspection of their sewers. The trial court held that the modification provisions of the agreements between St. Joseph and the subscribers were ambiguous and that the parties did not contemplate the ordinance passed by St. Joseph. The subscribers were, therefore, not required to comply with the ordinance.

St. Joseph now appeals claiming that the trial court erred because the agreement unambiguously required that Lake Contrary and Country Club comply with future St. Joseph ordinances, and a recently passed ordinance requires such inspection and testing. We affirm the trial court's judgment. The passage of the ordinance did not comport with St. Joseph's duty of good faith owed to the subscribers, and, therefore, St. Joseph was not entitled to the equitable relief that it sought.

**Facts and Background**

Pursuant to a Missouri Department of Natural Resources operating permit, St.

Joseph operated a sewage treatment plant, which treated sewage from the City of St. Joseph and sewage delivered to it from the subscribers. Virtually identical Sewer Subscription Agreements (the "agreements"), entered into in 1979 and 1988 respectively, governed the relationships between St. Joseph and Country Club and Lake Contrary. The agreements provided that the subscribers "shall conform to and be governed by City ordinances now in effect or hereafter enacted and any amendments thereto, pertaining to sewers and sewage disposal [and] sewage treatment." The agreements also provided that the subscribers "be solely responsible for the construction, maintenance and operation of its sewage collection system in an orderly manner and sanitary condition, at no expense to [St. Joseph]." A separate provision indicated that the agreement could be modified through the mutual consent of the subscribers, St. Joseph, the EPA, and the Missouri Department of Natural Resources. Under certain circumstances, St. Joseph had the right to inspect the subscribers' sewer lines at the subscribers' expense. St. Joseph "shall inspect construction of all building sewer connections and new main line sewers and sewer systems connected to the [St. Joseph] sewage system. [The subscribers] shall reimburse [St. Joseph] for the inspection of main line sewers at the rate of Thirty Cents ($.30) per foot of main line sewers constructed and inspected." The agreements also provided that the subscribers would indemnify St. Joseph against any loss it incurred from the subscribers' sewer systems. Residents of the subscribers who use the sewer system pay to St. Joseph a sewer use charge. The cost of sewer use charged to the residents is not described by the agreements.[1] These fees are not shared with the subscribers and the subscribers maintain and construct their own sewage collection lines. The trial court also determined that the agreements permitted St. Joseph to conduct its own inspections of the subscribers' sewage collection systems.[2]

Lake Contrary has approximately 1.25 miles of sewer lines and Country Club has approximately three miles. These sewer systems, which feed into St. Joseph's sewer system, are maintained and operated by the subscribers. The subscribers inspect and repair their sewage collection systems on an as needed basis. Lake Contrary has $2,500 in its maintenance account and $12,000 in its repair account. Lake Contrary does, however, receive a quarterly $30.00 T-hookup fee assessed to customers. Country Club had no reserve funds or funds in its general revenue set aside for sewer maintenance. St. Joseph has approximately 380 miles of sewer line within its boundaries. St. Joseph does not perform comprehensive preventative inspection and testing on its sewer system.

In May of 2005, St. Joseph passed an ordinance, which required that the subscribers perform comprehensive testing and inspection of their sewers lines ("2005 ordinance"). The 2005 ordinance is not applicable to St. Joseph's own sewer system. It was estimated that complying with the ordinance would cost Country Club between $100,000 and $150,000 and would cost Lake Contrary roughly $50,000. Prior to the passage of the ordinance, the Lake Contrary Sewer system received no complaints from the Missouri Department of Natural Resources or EPA. Moreover, St. Joseph presented no evidence that

1. The sewer use fee for the residents of Country Club is 230% more than St. Joseph residents' sewer use fee.

2. While this fact is in the trial court's judgment and undisputed for purposes of the appeal, such a provision does not appear in the record.

tended to show the subscribers' sewer systems were in poor condition.

St. Joseph notified the subscribers that they were in breach of the agreements and the 2005 ordinance. After multiple attempts by St. Joseph to compel the subscribers to conduct the comprehensive testing and inspection, the subscribers have not complied. St. Joseph then filed a petition seeking both a declaratory judgment indicating that the subscribers were obligated to comply with the new ordinance and a mandatory injunction causing the subscribers to inspect their sewers.

The trial court determined that the dual means for altering the agreement rendered the modification provisions ambiguous and then appeared to resort to parol evidence to determine that the inspection and testing were not contemplated by the parties at the time the agreements were entered into. Neither the Missouri Department of Natural Resources nor the EPA require the testing and inspections. Moreover, the trial court made a finding of fact that neither Lake Contrary nor Country Club has the funds to pay for the type of testing and inspection required by the ordinance. Both subscribers have adequately addressed specific problems with their respective sewer systems as they arose.

### Standards of Review

Determining whether a contract is ambiguous is a question of law, which this court reviews *de novo*. *Harris v. Union Elec. Co.*, 622 S.W.2d 239, 247 (Mo. App. E.D.1981). Likewise, the interpretation of an unambiguous contract is a question of law to which no deference is afforded to the trial court's holding. *Executive Bd. of Mo. Baptist Convention v. Carnahan*, 170 S.W.3d 437, 447 (Mo.App. W.D. 2005).

When reviewing a judgment, this court is concerned primarily with the cor-rectness of the trial court's conclusion and not necessarily the trial court's means of arriving at its conclusion. *Bus. Men's Assurance Co. of Am. v. Graham*, 984 S.W.2d 501, 506 (Mo. banc 1999). In a court-tried case, the judgment will be sustained unless there is no substantial evidence to support it, it is against the weight of the evidence, it erroneously declares the law, or it erroneously applies the law. *Murphy v. Carron*, 536 S.W.2d 30, 32 (Mo. banc 1976). On appeal, this court views the evidence and all reasonable inferences in the light most favorable to the judgment. *Mehra v. Mehra*, 819 S.W.2d 351, 353 (Mo. banc 1991).

### Ambiguity

The trial court held that the agreements between St. Joseph and the subscribers were ambiguous. We disagree. The agreements clearly, and without qualification, permitted St. Joseph to pass new, binding ordinances pertaining to the subscribers' sewer systems.

"Whether a contract is made and, if so, what the terms of that contract are, depend upon what is actually said and done and not upon the understanding or supposition of one of the parties." *Gateway Exteriors v. Suntide Homes*, 882 S.W.2d 275, 279 (Mo.App. E.D.1994). "Disregarding either party's secret surmise or undisclosed assumption, the court must ascertain the parties' meaning and intent as expressed in the language used and give effect to that intent." *Peet v. Randolph*, 33 S.W.3d 614, 618–19 (Mo.App. E.D.2000). "An ambiguity exists when there is more than one reasonable interpretation which can be gleaned from the contract language." *Harris*, 622 S.W.2d at 247. In determining if a contract is ambiguous, we review the terms of a contract as a whole, not in isolation. *Tuttle v. Muenks*, 21 S.W.3d 6, 9 (Mo.App. W.D.

2000). "This Court will not create an ambiguity by using extrinsic or parole evidence." *Lupo v. Shelter Mut. Ins. Co.*, 70 S.W.3d 16, 20 (Mo.App. E.D.2002).

The question before the trial court and now before us is the meaning of a clause, which seemingly permits St. Joseph to alter the agreements at will. The clause in question states:

> The [subscribers] shall conform to and be governed by [St. Joseph] ordinances now in effect or hereafter enacted and any amendments thereto, pertaining to sewers and sewage disposal, sewage treatment and sewer use charges, including all current general ordinances providing charges for customers receiving sewage treatment, industrial cost recovery, and [St. Joseph] building codes as they relate to construction of sewers, sewage collection systems, and sewer service line connections.

(Emphasis added.) The subscribers claim that the ambiguity in the method of modification sprang from a conflict with a later clause, which provides an alternate means of altering the contractual relation. That later clauses states:

> The terms of this Agreement may be modified at any time upon the mutual agreement of the parties and the United States Environmental Protection Agency and the Missouri Department of Natural Resources. The party proposing such modification shall, not less that forty-five (45) days prior to such modification, notify in writing the other party to this Agreement of the content of the proposed modification.

An ambiguity is said to arise when a contract "is reasonably susceptible of more than one meaning when the words are given their plain meaning as understood by an average person." *Daniels Express & Transfer Co. v. GMI Corp.*, 897 S.W.2d 90, 92 (Mo.App. E.D.1995). Here, the trial court's alternate reading of the contract is unreasonable.

The trial court held that the second paragraph "provides for modifications of the terms of the agreement *only* upon mutual agreement of the parties and of the United States Environmental Protection Agency and the Missouri Department of Natural Resources." (Emphasis added.) Nothing in the second clause relating to alteration of the agreement indicates that there was only a single means of modifying it and all other alterations to the agreement were prohibited. The agreement describes one means of alteration as modification through assent and a separate means of alteration as alteration through duly passed ordinances relating to sewers. It is unreasonable to conflate the two; the mere fact that the agreement provides two separate means for altering the agreement does not make the contract ambiguous.

Finally, we decline to employ parol or extrinsic evidence to discover an ambiguity. The trial court concluded that if the plain and extraordinarily broad reading of the contract was applied, St. Joseph would have carte blanche authority to rewrite the contract and such authority "was not the intention of the parties when entering into the contract." This line of argument places the cart ahead of the ox. It uses extrinsic evidence of the party's intent to vary the meaning of plain contract language.

> [T]he parol evidence rule provides only that parol evidence may not be used to vary or contradict the terms of a complete and unambiguous written contract absent fraud, common mistake, accident or erroneous omission. *Craig v. Jo B. Gardner, Inc.*, 586 S.W.2d 316, 324 (Mo. banc 1979). Collateral facts and circumstances may be introduced to ascertain the subject matter of the contract and to aid in its interpretation, but such facts

cannot cause the court to read into the contract something that it does not say, create an ambiguity or show an obligation other than expressed in the written instrument. *Id.*

*Harris,* 622 S.W.2d at 246–47. While the judgment is not entirely clear on its route toward a determination that the agreement was ambiguous, we decline to use evidence extrinsic to the written contract to cast ambiguity onto the agreement.

The parties did not memorialize their agreement in an ambiguous contract; rather, their agreement afforded significant unilateral discretion to St. Joseph and subjected the subscribers to the risk of future alteration by St. Joseph. Any other reading disregards the plain and ordinary meaning of the terms agreed to by the parties. We can attach no other reasonable interpretation to meaning of the words that the subscribers "shall ... be governed by [St. Joseph] ordinances now in effect or hereafter enacted and any amendments thereto, pertaining to sewers and sewage disposal."

## Analysis

▮▮▮▮ St. Joseph sought both a mandatory injunction compelling the comprehensive inspection and a declaratory judgment stating that the subscribers were in violation of their duty to inspect their sewers per the 2005 ordinance. Both injunctions and declaratory judgments are based on equitable principles. *See Newmark v. Vogelgesang,* 915 S.W.2d 337, 339 (Mo.App. E.D.1996) (an injunction is a form of equitable relief); *Preferred Physicians Mut. Mgmt. Group v. Preferred Physicians Mut. Risk Retention Group,* 916 S.W.2d 821, 823 (Mo.App. W.D.1995) ("An action pursuant to the Declaratory Judgment Act is *sui generis,* neither legal nor equitable,

but its historical affinity is equitable and such actions are governed by equitable principles.")

Generally, a court of equity will not assist a plaintiff who comes to court with unclean hands. A party who participates in inequitable activity regarding the very issue for which it seeks relief will be barred by its own misconduct from receiving relief. The inequitable activity does not need to be fraudulent in order for the party to be denied relief. Rather, a lack of good faith in bringing the suit is sufficient to deny the party equitable relief. 'What is material is not that the plaintiff's hands are dirty, but that [it] dirties them in acquiring the right [it] now asserts.'

*City of Kansas City v. N.Y.-Kan. Bldg. Assocs., L.P.,* 96 S.W.3d 846, 862 (Mo.App. W.D.2002) (internal citations omitted). The relief requested by St. Joseph would be inappropriate if the 2005 ordinance was not passed in good faith.

▮▮▮▮ The doctrine of good faith and fair dealing is central to an examination of St. Joseph's ability to exercise its discretion in passing the 2005 ordinance.[3] "Missouri law implies a covenant of good faith and fair dealing in every contract." *Farmers' Elec. Coop. v. Mo. Dep't of Corr.,* 977 S.W.2d 266, 271 (Mo. banc 1998). "[W]here 'a contract confers on one party a discretionary power affecting the rights of the other, a duty is imposed to exercise the discretion in good faith and in accordance with fair dealing.'" JOHN D. CALAMARI & JOSEPH M. PERILLO; CONTRACTS 474 (5th ed.2003). The unambiguous terms of the agreements allot to St. Joseph a discretionary power to pass ordinances binding on the subscribers, nevertheless, the 2005 ordinance, which required an immedi-

---

**3.** "[T]he fact that it is necessary to imply matters in a contract or lease *in order to uphold its validity does not give rise to an* ambiguity." *National Refining Co. v. Cox,* 227 Mo.App. 778, 57 S.W.2d 778, 782 (1933) (emphasis added).

ate comprehensive test and inspection of the entire system, does not comport with that covenant of good faith and fair dealing.

▬▬ The covenant of good faith and fair dealing encompasses an "obligation imposed by law to prevent opportunistic behavior, that is, the exploitation of changing economic conditions to ensure gains in excess of those reasonably expected at the time of contracting." *Spencer Reed Group, Inc. v. Pickett*, 163 S.W.3d 570, 574 (Mo.App. W.D.2005). "That duty prevents one party to the contract to exercise a judgment conferred by the express terms of agreement in such a manner as to evade the spirit of the transaction or so as to deny the other party the expected benefit of the contract." *Mo. Consol. Health Care Plan v. Cmty. Health Plan*, 81 S.W.3d 34, 45 n. 3 (Mo.App. W.D.2002). When a contract provides a single party with discretion, that discretion is not unlimited; it must not be exercised to deprive the other party of the benefit of the contractual relationship or evade the spirit of the bargain.

The 2005 ordinance attempts to fundamentally restructure the agreements in a manner that provides negligible benefit to St. Joseph at a significant cost to the subscribers without a reasonable motive or purpose for imposing such a cost. Both the structure of the agreement and the evidence of the parties' conduct leads us to the conclusion that St. Joseph did not pass the 2005 ordinance in good faith.

The primary method of determining that the 2005 ordinance was not passed in good faith is an examination of the structure of the agreements. The agreements are not particularly lengthy or complicated. They provided that St. Joseph would treat sewage delivered to it from the subscribers in a manner like St. Joseph treats its own sewage. The residents of Country Club and Lake Contrary would remit sewer usage and connection fees to St. Joseph.

The subscribers would be "solely responsible" for the construction and maintenance of its sewage collection systems in an "orderly manner and sanitary condition," and St. Joseph would not be responsible for operation and maintenance. St. Joseph also had a limited right to inspect the construction of sewers systems, main lines, and sewer connections at the expense of the subscribers. The agreement also indicated that the subscribers would indemnify St. Joseph for all third party claims arising out of the maintenance of the subscribers' sewers.

▬▬ The implied covenant of good faith prohibits contracting party from acting in " 'such a manner as to evade the spirit of the transaction or . . . to deny the other party the expected benefit of the contract.' " *Kopp v. Home Furnishing Ctr., LLC*, 210 S.W.3d 319, 327 (Mo.App. W.D. 2006) (quoting *Martin v. Prier Brass Mfg. Co.*, 710 S.W.2d 466, 473 (Mo.App. W.D. 1986)). Here, the relative benefits and duties of the agreements are patent. St. Joseph would treat the sewage from the subscribers and receive the income generated from the sewage disposal. The subscribers would be left "solely responsible" for maintaining their sewer systems, delivering the sewage to St. Joseph, and indemnifying St. Joseph against any loss from an improperly maintained sewer system. It is the subscribers' duty to inspect and maintain their sewer collection system. St. Joseph does not have an obligation to ensure the proper functioning of the subscribers' sewer collection system; rather, this duty rests "solely" on the subscribers. The agreement did not contemplate that St. Joseph would be able to manage the maintenance and operation of the sewer collection systems nor could it impose inspection costs on the subscribers except for the narrow cases of a new sewer line, connections, and main construction.

Moreover, the agreements contained a provision which provided that the subscribers would indemnify St. Joseph for any third party claims for loss or damages arising out of the subscribers' maintenance or operation of their sewer systems. This provision weakens St. Joseph's justification for imposing such a great cost on the subscribers. One of its purported rationales in imposing the cost was to diminish the probability of an inverse condemnation claim caused by a sewer backup. *See Akers v. City of Oak Grove*, 246 S.W.3d 916 (Mo. banc, 2008). Nevertheless, if a catastrophic sewage backup occurred, which was caused by the negligent maintenance of the subscribers' sewers, and St. Joseph was held liable, St. Joseph would be able to exercise its right to full indemnification under the contract. St. Joseph stands to lose very little if the subscribers' sewers are negligently maintained, and, therefore, it had little if any reasonable purpose in demanding the inspections.

Not only does the structure of the agreement lead us to believe that the 2005 ordinance was not passed in good faith, but the evidence presented by the parties indicates as much. Most telling of these factors, St. Joseph has not performed similar comprehensive testing and inspection on its own sewers as it attempts to foist such testing and inspection on the two smaller subscribing cities, nor does the ordinance in question, or a related ordinance, require that St. Joseph perform similar testing. Such testing is not cost effective for St. Joseph, and, likewise, it is not cost effective for the subscribers. The trial court found that St. Joseph does not perform the type of "comprehensive testing in its own system that it is demanding of [Country Club] and Lake Contrary. Such testing carries a cost that makes it prohibitive for

[St. Joseph] to undertake the testing of its own sewer collection system all at one time." It is unclear why St. Joseph imposes this substantial burden on the subscribers when it is unable or unwilling to undergo a similar burden itself.

Essentially, St. Joseph passed the ordinance because it feared a loss from a minimally inspected sewer system. But there was no evidence that the subscribers' sewers were in such a poor condition that a full system audit, at significant expense, was warranted. St. Joseph has not been denied access to inspect the subscribers' sewer system. Nor has the EPA or Missouri Department of Natural Resources filed a complaint concerning the subscribers' sewers. Compliance with the 2005 ordinance provided a negligible benefit to St. Joseph, while providing a heavy cost to the subscribers. We hold that this uncorroborated fear of the unknown is not a valid rationale to charge the two subscribers over $200,000.[4]

Likely, St. Joseph would respond to any claim that the ordinance was not passed in good faith by arguing that it had an express right to pass any ordinances related to the subscribers' sewers. "[T]here can be no breach of the implied promise or covenant of good faith and fair dealing where the contract expressly permits the actions being challenged, and the defendant acts in accordance with the express terms of the contract." 23 SAMUEL WILLISTON & RICHARD A. LORD, A TREATISE ON THE LAW OF CONTRACTS § 63.22 at 516 (4th ed.2002). *See Bishop v. Shelter Mut. Ins. Co.*, 129 S.W.3d 500, 505 (Mo.App. S.D.2004). Here, however, the contract did not expressly provide that St. Joseph could impose an additional inspection obligation on the subscribers—the agreement

---

4. We find it hard to imagine a scenario where St. Joseph could, in good faith, pass an ordinance which would impose a significantly more onerous burden on the subscribers than itself without first articulating a rational reason for the disparate treatment.

described the subscribers and St. Joseph's respective duties regarding inspection in another portion of the agreement. Nor does the agreement expressly permit St. Joseph to impose excessive costs on the subscribers or arbitrarily impose materially more onerous burdens on the subscribers than it would impose on itself. *See Cox v. CSX Intermodal, Inc.*, 732 So.2d 1092, 1098 (Fla.Dist.Ct.App.1999).

The contract did not impose on the subscribers an obligation to comply with the inspection and testing requirements purportedly required by the 2005 ordinance, nor does St. Joseph propose a good faith rationale for requiring such a testing regime. The 2005 ordinance attempted to fundamentally alter the nature of the relationship between the parties and in so doing imposed a significant burden on the subscribers. Such a fundamental change is oppressive in light of St. Joseph not assuming a similar obligation to inspect its own sewers and its lack of reasonable explanation for imposing such a burden only on the subscribers. Therefore, the trial court did not err in refusing to grant a declaratory judgment and mandatory injunction ordering the subscribers to comply with the ordinance.

## Conclusion

The judgment of the trial court is, therefore, affirmed.

All concur.