

# In the
# Missouri Court of Appeals
## Western District

HAWTHORN BANK AND HAWTHORN
REAL ESTATE, LLC.,

          Respondents,

v.

F.A.L. INVESTMENTS, LLC,
(SUCCESSOR TO GREEN AND
SAMSON, LLC), JERRY GREEN,
MELODY GREEN, RICHARD L.
SAMSON, INDIVIDUALLY AND AS
TRUSTEE OF THE RICHARD L.
SAMSON REVOCABLE LIVING
TRUST U/AD AND JANET SAMSON,

          Appellants.

WD77057
WD77145

OPINION FILED:

September 16, 2014

**Appeal from the Circuit Court of Cole County, Missouri**
**The Honorable Patricia S. Joyce, Judge**

**Before Division Two: Victor C. Howard, P.J., James Edward Welsh, and Anthony Rex Gabbert, JJ.**

Appellants Jerry and Melody Green and F.A.L. Investments, LLC, appeal the circuit court's judgment in favor of Hawthorn Bank and Hawthorn Real Estate, LLC (collectively, "Hawthorn") on Hawthorn's petition for declaratory judgment. Finding no error in the circuit court's judgment, we affirm.

## Background

The circumstances underlying this lawsuit began in 2008 when Jerry Green and Richard Samson[1] each held a fifty-percent interest in Green and Samson, LLC, a real estate development company. The company's sole asset consisted of seventy-eight acres of undeveloped property along Highway 179 in Cole County (the "Highway 179 Property").

A deed of trust on the Highway 179 Property secured four promissory notes owed to Hawthorn Bank[2] by Green and Samson, LLC, and Hazel Hills Development (also jointly owned by Green and Samson). Those four notes, totaling $1.78 million, each had a maturity date of November 30, 2008. In late 2008, Green began to negotiate with Hawthorn about an agreement to extend the maturity date of those notes.

During this time, Samson was experiencing financial difficulties with his own business, FAB Building Center, Inc. ("FAB"). Among other things, FAB owed Hawthorn $2,211,450 (the "FAB Debt") on seven notes that were past due and in collection status. Concerned about the effect that Samson's financial difficulties might have on their jointly held companies, Green thought it "imperative" that Samson transfer his interest in the companies to him.

On April 27, 2009, Green and Samson entered into a Membership Interest and Stock Purchase Agreement (the "Purchase Agreement"), which provided for the immediate transfer to Green of Samson's one-half interest in both Hazel Hills and Green and Samson, LLC (which Green renamed F.A.L. Investments, LLC ("FAL")). The consideration received by Samson

---

[1]Although Samson's businesses are held in the name of the "Richard L. Samson Revocable Living Trust U/D/A September 17, 1998," for the sake of brevity "Samson" is used to refer to both the Trust and the individual.

[2]"A loan transaction typically consists of a promissory note and a security interest, such as a deed of trust." *Richard v. Wells Fargo Bank, N.A.*, 418 S.W.3d 468, 473 (Mo. App. 2013). "A deed of trust pledges land to secure a debt and entitles its holder to foreclose on property under certain circumstances." *Id.*

included a waiver of over $108,000 in past-due capital contributions that he owed the companies and Green's agreement to secure payment of FAB's $2.21 million debt to Hawthorn.

Four days later, on May 1, 2009, Melody and Jerry Green, individually, and Jerry Green, on behalf of FAL and Hazel Hills, entered into a "Loan Agreement" with Hawthorn Bank. Loan Officer James Vossen executed the agreement on behalf of Hawthorn. The Loan Agreement incorporated twenty separate promissory notes owed to Hawthorn. These included the notes of FAL, Hazel Hills, and FAB (in accordance with the terms of the Purchase Agreement), the notes of the Greens themselves, and a new note on a $470,000 line of credit. The Loan Agreement further provided that Green would grant Hawthorn an "additional deed of trust" on the Highway 179 Property to secure the $2.21 million of FAB Debt, and neither FAL nor the Greens would have personal liability for repayment of the FAB Debt. Paragraph 7 of the Loan Agreement established that the proceeds from any sale of the Highway 179 Property would first be applied to the debts of FAL and Hazel Hills and then half of "any remaining proceeds" would be applied toward payment of the FAB Debt. The Loan Agreement extended the date for payment of the principal on all the notes to May 1, 2012. During that time, only interest on the notes would be due and payable. The Agreement also provided that Hawthorn would not "under any circumstance extend the date for full payment of all Obligations beyond May 1, 2012."

As agreed, on May 1, 2009, Green executed a "Deed of Trust" in favor of Hawthorn, pledging the Highway 179 Property as security on all twenty promissory notes. The Deed of Trust contained a "due on sale" clause permitting Hawthorn, "at its option, [to] declare the entire balance of the Secured Debt [$6,579,937] to be immediately due and payable upon . . . sale of the Property" and which "shall remain in effect until the Secured Debt is paid in full and this Security Instrument is released."

3

In October 2011, Green met with Vossen and another Hawthorn Bank official. The bank officers advised Green that Hawthorn would not renew the Loan Agreement after May 1, 2012, and would not refinance any of the notes secured by the Deed of Trust. In order to avoid default and foreclosure, Green resolved to sell the Highway 179 Property. In late March 2012, Green executed a contract on behalf of FAL to sell the property to an "undisclosed buyer." That buyer turned out to be a limited liability company that Green and two other investors had recently formed, named "The Commons on 179, LLC." Green was the majority owner (owning 60% of the company) and the Managing Member.[3]

On March 30th, the title company contacted Hawthorn for the payoff amount on the Highway 179 Property, and Hawthorn provided the amount required to pay off the entire debt secured by the Deed of Trust (about $4.5 million). Five days later, on April 4th, the title company informed Hawthorn that $2,273,570 had been placed in escrow and would be transmitted to it upon the full release of the Deed of Trust. The amount that Green sought to tender was the amount needed to pay off all the notes secured by the Deed of Trust, *except for* the $2.21 million FAB Debt. Hawthorn told the title company that the amount tendered was less than the payoff amount it had earlier provided and that it would not release the Deed of Trust.

Hawthorn thereafter filed suit against the Greens, FAL, and the Samsons seeking a declaration that the contract for sale of the Highway 179 Property did not require Hawthorn to execute and deliver a full deed of release and that it was entitled to enforce its rights under the notes, obligations, deeds of trust, and security interests. Hawthorn claimed that the contract for sale triggered its right under the Deed of Trust to accelerate the $2.21 million FAB Debt, making

_____

[3]The Commons on 179, LLC, is 60% owned by Jerry and Melody Green, 20% is owned in trust by Thomas and Christine Carr, and 20% is owned in trust by William Marshall.

4

that amount immediately due and payable.  Hawthorn also alleged that Green violated the implied covenant of good faith and fair dealing by selling the Highway 179 Property for less than fair market value and by selling it to an entity controlled by Green.  The defendants responded by filing various counterclaims and cross-claims.

After a two-day bench trial, the circuit court entered judgment in favor of Hawthorn.  The court ruled that the Deed of Trust continues to secure "past due principal of $4,462,724.75 ($2,211,451 of such debt being the [FAB Debt])."  The court held:  (1) that the "due on sale" clause required FAL to pay the $2.21 million FAB Debt, in addition to the amounts owed by the Greens and FAL; (2) that the sale of the secured property for considerably less than its fair market value to a company primarily owned by Green violated the implied covenant of "good faith and fair dealing"; and (3) that Hawthorn is entitled to foreclose on the Deed of Trust.  The court dismissed all of the counterclaims and cross-claims as moot.

## Standard of Review

As with any court-tried case, we will affirm the circuit court's decision in a declaratory judgment action unless it is against the weight of the evidence, there is insufficient evidence to support it, or it erroneously declares or applies the law.  *Weber v. Moerschel*, 313 S.W.3d 220, 223 (Mo. App. 2010).  We will reverse a judgment as against the weight of the evidence only if we firmly believe that it is wrong.  *Murphy v. Carron*, 536 S.W.2d 30, 32 (Mo. banc 1976).

## Discussion

The Appellants raise five points on appeal.  We find Point II to be dispositive.  In it, the Appellants assert that the circuit court erred in ruling that FAL's sale of the Highway 179 Property violated the "implied covenant of good faith" by failing to sell the property for "fair market value" in an "arm's length transaction."  The Appellants contend that Paragraph 7 of the

5

Loan Agreement establishes the amount to which Hawthorn is entitled upon sale (*i.e.*, the amount needed to satisfy the debts of FAL and the Greens) and imposes no additional conditions or limitations on the sale. The Appellants argue, alternatively, that the evidence establishes that they acted in good faith in selling the property for $1.78 million.

The circuit court determined that the Loan Agreement and the Deed of Trust are part of the same credit agreement, are not inconsistent or ambiguous, and must be construed together to enforce the rights and obligations of the parties. *See, e.g., Wilson v. Reed*, 193 S.W. 819, 820 (Mo. 1917) ("note and . . . deed of trust, given to secure it, both executed at one time, are one contract and must be construed together"). The court concluded that upon sale of the Highway 179 Property, the Deed of Trust's "due on sale" clause accelerated the due date of all unpaid secured debt in the Loan Agreement. The court also determined that the Appellants had breached the implied duty of good faith and fair dealing.

Under Missouri law, an implied covenant of good faith and fair dealing exists in every contract, including contracts for the sale of real estate. *See, e.g., Swartz v. Mann,* 160 S.W.3d 411, 414 (Mo. App. 2005); *Howard v. Youngman*, 81 S.W.3d 101, 110 (Mo. App. 2002); *Wooten v. DeMean*, 788 S.W.2d 522, 527 (Mo. App. 1990). For example, Missouri imposes a "duty of reasonable diligence and good faith" upon a buyer who enters into a real estate sales contract with a provision making the sale contingent upon the buyer's obtaining financing. *Swartz*, 160 S.W.3d at 414. A buyer who enters into such an agreement "has an *implied* obligation to undertake reasonable efforts to secure the financing set forth in [the] contract." *Id*. Under such a provision, if the buyer is unable to obtain financing, "the buyer is *ipso facto* excused from performance." *Id*. This rule presumes, however, that the buyer acted in "good faith" in attempting to obtain the needed financing. *Id.*; *see also Howard*, 81 S.W.3d at 110.

6

Whether a party to a contract has exercised good faith is a "question of fact" that is "dependent to a great extent on credibility determinations to be made by the fact finder." *Swartz*, 160 S.W.3d at 415. A trial court is free to disbelieve any, all, or none of the evidence. *White v. Dir. of Revenue*, 321 S.W.3d 298, 308 (Mo. banc 2010). We defer to the circuit court on factual issues due to its superior position from which to judge not only "the credibility of witnesses" but also "their sincerity and character and other trial intangibles which may not be completely revealed by the record." *Id*. at 308-09.

The contract for sale was for substantially less than multiple valuations provided by Jerry Green himself and substantially less than numerous appraisals performed by real estate professionals over the years. Specifically, Green had represented to Hawthorn in his personal financial statement that, as of May 15, 2009, the Highway 179 Property's fair market value was $6 million and that $5,784,292 in debt to Hawthorn was secured by the property. On April 23, 2010, Green gave Hawthorn an updated financial statement that valued the property in an "undeveloped state" at $7.5 million (and at $12.5 million with the construction of a highway interchange), and stated that the property secured $5,596,230 in debt to Hawthorn. In January 2012, just a few months before executing the contract to sell the property for $1.78 million, Green informed Hawthorn that one-half of the Highway 179 Property had a fair market value in excess of $7 million. In late 2010, in seeking loans from Thomas Carr and William Marshall (his two partners in the later-established "The Commons on 179, LLC"), Green's proposal projected the sale of thirty lots and a bank release of $150,000 per lot, resulting in payments of $4.5 million to Hawthorn. That $4.5 million consisted of the Green's original obligations of approximately $1.78 million, the $470,000 line of credit, and the $2.21 million FAB Debt.

7

Additional evidence of value was presented via professional real estate appraisals. In April 2003, a real estate firm appraised the Highway 179 Property for FAL at a fair market value of between $5.44 million and $6.12 million. This appraisal is in Hawthorn Bank's loan file and was considered in making the initial loan. In December 2007, the same firm appraised the property for Hawthorn and concluded that it had a market value $4.2 million. In February 2009, the firm prepared an updated appraisal and placed the market value at $5.65 million. On March 12, 2012, the same firm appraised the Highway 179 Property for Mid-America Bank (with which The Commons on 179 had applied for financing) and found that it had a market value of $7.05 million. In his financial statement to Mid-America Bank, Green represented that the Highway 179 Property had a market value of $15 million, as is, and that it could be developed and sold for $18.6 million. Mid-America valued the property, for purposes of the loan, at $9 million based on the professional appraisals and Green's representations.

Hawthorn's retained expert appraised the property in April 2012 and concluded that, with the construction of a proposed nearby hospital, the property had a fair market value of $5.7 million, or a fair market value of $5 million, as is. FAL's retained expert, Wayne Stonestreet, valued the Highway 179 Property at $1.5 million. Stonestreet's valuation was substantially lower than those of all the other appraisers primarily due to differences in opinions about the property's "highest and best use" and about the appropriate "comparables" to use.

Based on the foregoing, the circuit court concluded that "the purported sale . . . was not an arm's length transaction, since the contract of sale was with . . . a limited liability company 60% owned by Jerry Green, and did not represent fair market value." The court concluded, based on the "numerous and repeated representations by Mr. Green to prospective investors, lenders and others, as well as from a number of appraisals," that the market value of the property

8

"was well above the attempted sale price and likely in excess of $5,500,000." The court found that the testimony of FAL's expert, Wayne Stonestreet, "was not credible," in that he "failed to properly consider the Highway 179 Property's highest and best use, was hired specifically for his testimony in this lawsuit, and his opinion of value was overtly low and in stark contrast to the opinion of all other appraisers."

The court concluded that FAL's contract to sell the Highway 179 Property was "an attempt to circumvent its contractual obligations" to Samson and Hawthorn and violated the implied covenant of good faith and fair dealing. The court further found that FAL's attempted sale breached the Loan Agreement and Deed of Trust and its obligations to Samson under the Purchase Agreement to secure the FAB Debt. As a result of that breach, an amount sufficient to satisfy all the unpaid secured debt was never tendered. Consequently, the circuit court concluded that "the May 1, 2009 deed of trust continues to secure payment of the FAB Debt after May 1, 2012," that FAL, Hazel Hills, and the Greens are in default under the Loan Agreement and Deed of Trust, and that Hawthorn is "entitled to enforce all of [its] rights under the deed of trust including the power of sale."

The court did not err in so finding. The purpose of the covenant of good faith is to prevent one party from using the express terms of an agreement so as to "evade the spirit of the transaction" or to "deny the other party the expected benefit of the contract." *City of St. Joseph v. Lake Contrary Sewer Dist.*, 251 S.W.3d 362, 370 (Mo. App. 2008). Contrary to the Appellants' claim that the circuit court is seeking to impose "unwritten" contract provisions, the covenant of good faith and fair dealing is, by law, present in every contract and need not be added. *See Spencer Reed Group, Inc. v. Pickett*, 163 S.W.3d 570, 574 (Mo. App. 2005); *see also Bishop v. Shelter Mut. Ins. Co.,* 129 S.W.3d 500, 505 (Mo. App. 2004) (if the provision is not expressly

9

included in the contract, "then it will be implied"). The covenant of good faith is an "obligation imposed by law to prevent opportunistic behavior, that is, the exploitation of changing economic conditions to ensure gains in excess of those reasonably expected at the time of contracting." *Frontenac Bank v. T.R. Hughes, Inc.*, 404 S.W.3d 272, 280 (Mo. App. 2012).

FAL's actions demonstrate just such "opportunistic behavior." Upon entering into the Loan Agreement and during the term of that agreement, Green acknowledged that the entire debt (including the FAB Debt) was secured by the Highway 179 Property. It was only after Hawthorn advised him that it would not refinance his notes that Green decided that the contract did not require payment of the entire $4.5 million debt after all. Thereafter, Green executed a contract to sell all of the Highway 179 Property for $1.78 million, a sum that would not have paid *any* of the FAB Debt. That sale would have allowed Green to acquire Samson's 50% interest in FAL and Hazel Hills without being obligated to use the Highway 179 Property to secure payment of the $2.21 million FAB Debt (despite his agreement to do so). It would have meant, basically, that Samson had transferred his ownership interest in the two companies for little or no consideration. Moreover, Green would have obtained from Hawthorn a three-year extension for payment of the FAL and Hazel Hills notes, a three-year moratorium on payment of principal on those debts, and a new line of credit for $470,000 from Hawthorn also for little or no consideration. In short, neither Samson nor Hawthorn would have received the consideration that Green had promised, but Green would have received all of the consideration that he was promised by them.

In sum, the court did not err in concluding that Green's attempt to sell the Highway 179 Property to an entity that he controlled, at a price significantly below fair market value, was a blatant effort by Green to avoid his contractual obligations and, therefore, violated the "implied

10

covenant of good faith." Consequently, the Appellants' claim (raised both in this Point and in Point I) that Paragraph 7 of the Loan Agreement establishes the amount to which Hawthorn is entitled upon sale, and that that amount is $1.78 million, is without merit and does not warrant reversal. Point II is denied.

As noted, the Appellants similarly argue in Point I that the amount due Hawthorn from the sale of the Highway 179 Property is governed by Paragraph 7 of the Loan Agreement and that, when FAL tendered $1.78 million, it satisfied the secured obligation and extinguished the power of sale in the Deed of Trust. We have already rejected this contention in Point II, *supra*. Point I is denied.

In their final three points, the Appellants contend that the circuit court erred in misapplying three different "writing" requirements. In Point III, they claim that the court violated the "merger doctrine" and the "parol evidence rule" by considering extrinsic evidence about the Green and Samson "Purchase Agreement." In Point IV, the Appellants contend that the court violated the "statute of frauds" (§ 432.010, RSMo 2000) by imposing unwritten terms and conditions on the sale of the property, primarily the implied covenant of good faith and fair dealing. In Point V, the Appellants assert that the court erred in denying their claim that Hawthorn's demand for an "interest" payment of $2.21 million violates Missouri's usury laws. In light of our resolution of Point II (in which we found that the court did not err in applying the covenant of good faith and fair dealing or in rejecting the Appellants' claim that the tender of $1.78 million satisfied all of their obligations secured under the Deed of Trust), none of these arguments warrants reversal. Consequently, we need not further address them.

Points III, IV, and V are denied.

11

**Conclusion**

We find no error of law or lack of evidence to support the circuit court's judgment in favor of Hawthorn on its declaratory judgment action; nor did the court err in finding that the counterclaims and cross-claims are moot. We affirm the circuit court's judgment.[4]

/s/ JAMES EDWARD WELSH
James Edward Welsh, Judge

All concur.

---

[4]In light of our decision to affirm the circuit court's judgment in favor of Hawthorn, we deny the Appellants' motion for attorneys' fees on appeal, which was taken with the case.